John T. Jasnoch (CA 281605)
**SCOTT + SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565
Fax: (619) 233-0508
jjasnoch@scott-scott.com

*Co-Lead Counsel for Lead Plaintiff Clement Matthys
and the Class*

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELO RONDINI, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>KYVERNA THERAPEUTICS, INC., PETER MAAG, RYAN JONES, DOMINIC BORIE, JAMES CHUNG, KAREN WALKER, IAN CLARK, FRED E. COHEN, BRIAN KOTZIN, STEVE LIAPIS, BETH SEIDENBERG, and DANIEL K. SPIEGELMAN,<br><br>    Defendants. | Case No.: 5:24-cv-08869-PCP<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u><br><br>Judge: Hon. P. Casey Pitts<br>Date: December 11, 2025<br>Time: 10:00 a.m.<br>Ctrm: 8 |

# **TABLE OF CONTENTS**

ISSUES TO BE DECIDED ...........................................................................................1

INTRODUCTION ......................................................................................................1

STATEMENT OF FACTS ...........................................................................................3

    A.  Kyverna and Its Clinical Trials of KYV-101 in Lupus
       Nephritis Patients ............................................................................................3

    B.  The Offering Documents Report Promising Initial Trial Results ...........................4

    C.  By the IPO, The Condition of Two of Three Patients Had
       Materially Worsened ........................................................................................5

    D.  Market Reaction to Kyverna's June 14, 2024 Disclosures ...................................7

LEGAL STANDARD ..................................................................................................7

ARGUMENT ...........................................................................................................8

    A.  Rule 9(b) Does Not Apply To These Claims ...........................................................8

       1.  The Complaint Does Not "Sound in Fraud" .......................................................8

       2.  None of Defendants' Cherry-Picked Language Comes Close to
          Showing That the Complaint "Necessarily" Sounds in Fraud ...........................9

       3.  In Any Event, The Complaint Alleges Falsity With Ample Particularity ........11

    B.  The Complaint Does Not Constitute Impermissible "Puzzle Pleading" ................12

    C.  Accurately Reporting Historical Data Does Not Excuse Omitting
       Current Material Information ...................................................................................13

    D.  The AC's Allegations that the Omitted Facts Were Available to
       Defendants Pre-IPO Are All Well-Pled, And Supported On Multiple,
       Independent Grounds ...............................................................................................16

       1.  The AC's Easily Meets The Applicable "Plausibility" Test, Even
          Without Any Confidential Witness Allegations ...............................................17

       2.  The Cited Confidential Witnesses Further Support the AC's Well-Pled
          Allegations of Materially Misleading Statements and Omissions ...................18

i

E.  The Offering Documents' Stated Risk Factors Were Affirmatively
Actionable Under *Alphabet*, And Also Separately Actionable
Under Item 105 .......................................................................................................21

    1.  The Offering Documents' Cited Risk Factors Were
Actionably Misleading.....................................................................................21

    2.  Separately, The Offering Documents Also Violated Item 105........................21

F.  Plaintiff Asserts Valid Claims for Violations of Item 303.....................................22

G.  Plaintiff Need Not Himself Have A §12(a)(2) Claim In Order To Bring
Such Claims On Behalf of Absent Class Members Who Do Have
Such Claims ............................................................................................................24

H.  The Section 15 "Control Person" Claims Are Adequately Pled .............................25

I.  Response to Defendants' Request for Judicial Notice ...........................................25

CONCLUSION..................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*In re Alphabet, Inc. Sec. Litig.*,
 1 F.4th 687 (9th Cir. 2021) ................................................................................................7, 17, 19, 21

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)..........................................................................................................................7

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)..........................................................................................................................7

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...................................................................................23

*In re Block, Inc. Sec. Litig.*,
 2024 WL 639470 (S.D.N.Y. Feb. 15, 2024).....................................................................................25

*Boston Ret. Sys. v. Uber Techs., Inc.*,
 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ..............................................................................12, 13, 22

*In re Charles Schwab Corp. Sec. Litig.*,
 257 F.R.D. 534 (N.D. Cal. 2009)......................................................................................................9

*City of Birmingham Rel. & Ret. Sys. v. Acadia Pharma., Inc.*
 2023 WL 1769810 (S.D. Cal. Feb. 2, 2023) ...................................................................................14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
 856 F.3d 605 (9th Cir. 2017) ...........................................................................................................10

*In re Convergent*,
 948 F.2d at 512 ................................................................................................................................15

*In re Countrywide Fin. Corp. Sec. Litig.*,
 588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..........................................................................................25

*In re Daou Sys., Inc.*,
 411 F.3d 1006 (9th Cir. 2005) ..............................................................................................8, 19, 20

*In re Facebook, Inc. Sec. Litig.*,
 87 F.4th 934 (9th Cir. 2023) .....................................................................................................13, 21

*Felipe v. Playstudios Inc.*,
 2024 WL 1380802 (D. Nev. Mar. 31, 2024) ...................................................................................22

*Fishbury, Ltd. v. Connetics Corp.*,
 2006 WL 3711566 (S.D.N.Y. Dec. 14, 2006) .................................................................................24

*Flynn v. Sientra, Inc.*,
 2016 WL 3360676 (C.D. Cal. June 9, 2016) ...................................................................................12

iii

*Franchi v. SmileDirectClub, Inc.*,
   633 F. Supp. 3d 1046 (M.D. Tenn. 2022)...................................................................23

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
   97 F.4th 1171 (9th Cir. 2024) .................................................................................14

*In re GlenFed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994) ..................................................................................12

*In re Global Crossing Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003)......................................................................24

*Golubowski v. Robinhood Mkts., Inc.*,
   2023 WL 1927616 (N.D. Cal. Feb. 10, 2023) .........................................................22

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)..................................................................................................8

*Hevesi v. Citigroup Inc.*,
   366 F.3d 70 (2d Cir. 2004)......................................................................................24

*Hildes v. Arthur Andersen LLP*,
   734 F.3d 854 (9th Cir. 2013) .................................................................................7, 8

*Huang v. Higgins*,
   2019 WL 1245136 (N.D. Cal. Mar. 18, 2019).........................................................20

*Karinski v. Stamps.com, Inc.*,
   2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ...........................................................12

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) .......................................................................14, 15, 25

*In re Lyft Inc. Sec. Litig.*,
   484 F. Supp. 3d 758 ................................................................................................22

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)...............................................................................................8, 16

*In re Merix Corp. Sec. Litig.*,
   275 F. App'x 599 (9th Cir. 2008) ............................................................................11

*Murphy v. Precision Castparts Corp.*,
   2017 WL 3084274 (D. Or. June 27, 2017) ..............................................................12

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ............................................................................14, 22

*In re Orange 21 Inc. Sec. Litig.*,
   2006 WL 8455352 (S.D. Cal. Mar. 30, 2006) ...........................................................9

iv

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. Jul. 21, 2020)..................................................................22

*Ralston v. Mortg. Inv. Group, Inc.*,
    2011 WL 4081696 (N.D. Cal. Sept. 12, 2011) ................................................................25

*In re Rigel Pharma., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ...................................................................................8, 16

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ........................................................................................8

*Safron Cap. Corp. v. Leadis Tech., Inc.*,
    274 F. App'x 540 (9th Cir. 2008)....................................................................................9

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ........................................................................................14

*Sohovich v. Avalara, Inc.*,
    2025 WL 957895 (9th Cir. Mar. 31, 2025)................................................................2, 13

*In re Stac Elects. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) .....................................................................................9, 24

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ................................................................................22, 23

*Sundaram v. Freshworks Inc.*,
    2023 WL 6390622 (N.D. Cal. Sept. 28, 2023) ..............................................................24

*Thant v. Rain Oncology Inc.*,
    2025 WL 588994 (N.D. Cal. Feb. 24, 2025) ................................................................11

*In re Ubiquiti Net., Inc. Sec. Litig.*,
    669 F. App'x 878 (9th Cir. 2016) ..................................................................................8

*United Assoc. Nat'l Pens. Fund v. Carvana Co.*,
    759 F. Supp. 3d 926 (D. Ariz. 2024) .......................................................................12, 22

*Universal Health Servs., Inc. v. U.S.*,
    579 U.S. 176 (2016)......................................................................................................14

*In re Vaxart, Inc. Sec. Litig.*,
    576 F. Supp. 3d 663 (N.D. Cal. 2021) ..........................................................................15

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
    712 F. Supp. 2d 958 (N.D. Cal. 2010) ..........................................................................25

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)...................................................................................19, 20

v

**Statutes**

15 U.S.C. 77k(a) .......................................................................................................................1, 2, 14

15 U.S.C. §12(a)(2)...............................................................................................................1, 2, 7, 24

15 U.S.C. §78u–4(b)(1) ...................................................................................................................11

Exchange Act §10(b) ...................................................................................................................8, 11

Securities Act.......................................................................................................................1, 8, 9, 11

**Other Authorities**

17 C.F.R. § 229.105(a)......................................................................................................................22

17 C.F.R. §229.303(b)(2)(ii).............................................................................................................22

54 Fed. Reg. 22427, 22430 (May 24, 1989) No. 34-26831 ............................................................23

Rule 8(a)..................................................................................................................................8, 17, 22

Rule 9(b) ................................................................................................................................ *passim*

Lead Plaintiff Clement Matthys ("Plaintiff") respectfully submits this Opposition (a) to the Kyverna Defendants' Motion to Dismiss (the "MTD," ECF 54) the Amended Complaint ("AC" or Complaint"), and (b) to the Underwriter Defendants' Joinder in the MTD. ECF 57.[1]

## ISSUES TO BE DECIDED

1.  Does the AC "necessarily" sound in fraud, such that Rule 9(b) applies?

2.  Whether or not Rule 9(b) applies, does the AC allege actionable misrepresentation and omission claims under §11 & §12(a)(2) of the Securities Act, 15 U.S.C. §§77k & 1(a)(2)?

3.  May Plaintiff assert (and preserve) §12(a)(2) claims on behalf of absent class members that he himself does not have, at least until class certification?

## INTRODUCTION

Kyverna, a company with no approved drugs or product sales, raised $319 million in its February 7, 2024 IPO based primarily on the apparent promise of its lead drug candidate, KYV-101, as a treatment for lupus and other autoimmune diseases. Kyverna had recently commenced two small, Phase I/II clinical trials to test KYV-101—and although those "KYSA" trials had only three enrolled patients with enough data to be reported in the Offering Documents, that data appeared to be very promising.  In particular, the Offering Documents (as defined below) contained multiple charts showing that each of the three patients had improved significantly based on four key biometric measures. ¶¶3-6.[2]

Unbeknownst to investors, however, the Offering Documents' positive representations about KYV-101—including the reported patient data from the two ongoing KYV-101 trials— were materially inaccurate, incomplete, and misleading because they failed to disclose that, as of the IPO, the most current data for at least two of the three patients was decidedly negative rather than positive.  When Kyverna belatedly disclosed the previously omitted information at a conference on June 13, 2024, markets were shocked, and Kyverna shares plummeted nearly

---

[1] Defendants consist of Kyverna Therapeutics ("Kyverna" or "the Company"); Kyverna officers or directors Ian Clark, Fred Cohen, Brian Kotzin, Steven Liapis, Beth Seidenberg, Daniel Speigelman, Ryan Jones, Dominic Boric, Karen Walker, Peter Maag, and James Chung's (the "Individual Defendants"), and J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Leerink Partners LLC, and Wells Fargo, LLC (the "Underwriter Defendants").

[2] All cites to "¶__" are to paragraphs of the AC, ECF No. 49.

1

45% over the next two trading days, from $14.44 to only $7.89 per share. ¶¶7-8, 82. Plaintiff, on behalf of himself and the proposed class, now seeks to recover for the losses they suffered pursuant to §§11 & 12(a)(2)'s strict liability provisions for defective offering documents.

Defendants' threshold pleading argument, that Rule 9(b) applies because the AC "sounds in fraud", fails as the AC is based on strict liability and negligence, and plainly does not "necessarily" allege fraud. But even if Rule 9(b) applied, the AC pleads with particularity the "who, what, when, where and how" of the alleged misleading statements and omissions.

Defendants next assert that Plaintiff may not allege a §11 or §12 violation based on the publication of "accurate historical data." MTD at 2. But they ignore both the statute and long-settled case law that literally true statements (including "half-truths") are actionable where they "omit[] to state a material fact required … to make the statements therein [at the time they were made] not misleading." 15 U.S.C. 77k(a); *see also* 15 U.S.C. §12(a)(2); *Sohovich v. Avalara, Inc.*, 2025 WL 957895, at \*3 (9th Cir. Mar. 31, 2025) (the disclosure required by law "'is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead'") (internal citation omitted). Nor is the AC remotely a "puzzle pleading." Instead, the 34-page AC provides Defendants with a clear statement of the claims, detailing how they issued Offering Documents that touted positive information about Kyverna's flagship drug candidate, while negligently failing to ensure that those Documents also contained more current information that was patently ***negative***.

Defendants, as if this were a post-discovery summary judgment motion, then resort to disputing the facts alleged, claiming "there was no 'adverse information' before the [February IPO] that could have been reported in the Offering Documents." MTD at 2. But the AC's allegations are based on *Defendants'* own statements and common-sense inferences—and the equally well-pled former employee statements provide damning corroboration.

Defendants' attack on Plaintiff's additional, independent bases for liability under Items 105 and 303 of Regulation S-K similarly fail. And although Plaintiff has no §12(a)(2) claims of his own, the remedy here is not dismissal of all such claims, but allowing another class member with such claims to assert them at class certification.

In sum, Defendants' arguments repeatedly dodge or mischaracterize the facts alleged, and misstate or ignore the applicable law.  Defendants' motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.  Kyverna and Its Clinical Trials of KYV-101 in Lupus Nephritis Patients

As of its February 2024 IPO, Kyverna's leading drug candidate, KYV-101, was in the very early stages of clinical development. ¶4.  The Offering Documents (notably the January 16, 2024 Registration Statement and February 6 Amended S-1) promoted KYV-101's potential to provide therapeutic benefits in a "broad range of B-cell driven autoimmune diseases." ¶44.  But as of the IPO, KYV-101 had only been tested on a handful of patients with the autoimmune disease lupus nephritis ("LN") in two small, ongoing Phase I/II trials: (1) the U.S.-based KYSA-1 trial, and (2) the German-based KYSA-3 trial. ¶¶3-4, 46. And as of the IPO, the Company had enrolled and treated only three patients: two in KYSA-1 and one in KYSA-3.

Treatment with KYV-101 consists of a single infusion of CD19 CAR T-cells. ¶45. In both studies, KYV-101's effect was evaluated using four biometrics, based on blood and urine samples collected from each patient on a regular basis.  ¶47.  These biometrics were:

(1) **Urinary Protein-Creatinine Ratio ("UPCR") levels**.  UPCR levels reflect LN disease activity.  A UPCR of 0.5 is the accepted threshold for a diagnosis of LN, with higher levels associated with higher LN disease activity.  Accordingly, decreases in UPCR in LN patients show improvement (whereas increases in UPCR levels are adverse).  ¶48.

(2) **Anti-dsDNA levels**.  Anti-dsDNA levels also reflect LN disease activity, with levels above 200 IU/mL deemed strongly indicative of active LN.  Accordingly, decreases in UPCR in LN patients are beneficial (while further increases are adverse). ¶49.

(3) **C3 complement protein levels**.  *Low* C3 complement protein levels are associated with LN disease activity, with C3 levels *below* 80 mg/dL associated with active LN.  Accordingly, while decreasing UPCR and anti-dsNDA levels in LN patients are beneficial, *increasing* C3 levels are beneficial (and declines are adverse). ¶50;

(4) **C4 complement protein levels**.  As with C3 levels, low C4 levels are associated with LN disease activity (with C4 levels *below* 15 mg/dL associated with active LN), and accordingly *increasing* C4 levels are beneficial (and declines are adverse). ¶50.

As confirmed by one of Plaintiff's sources (former employee #3) and detailed below, after the KYSA patients' blood and urine samples were drawn the samples would be processed by a lab and results obtained within 24 hours. The test results then would be recorded in the patient's

3

electronic medical record ("EMR").  EMR data would be immediately accessible to the clinical trial study site coordinator, and would also be entered into Kyverna's Electronic Data Capture System ("EDC System"), where Kyverna personnel could also view it.  ¶72.

### B.  The Offering Documents Report Promising Initial Trial Results

As only three patients had been treated with KYV-101 as of the IPO, all data showing their response to KYV-101 treatment was highly material to investors in evaluating KYV-101's ability to reduce LN disease activity (interest that was especially keen as Kyverna had no current product sales, and the KYSA trials of KYV-101 were the only ones underway).

The Offering Documents reported clinical data for each of the three patients who had been dosed as of December 31, 2023, including charts depicting each patient's UPCR, anti-dsDNA, C3, and C4 levels over time.  As these charts showed, each patient's biometrics evidenced significant LN activity in the period before they were dosed with KYV-101—but each had significantly improved after KYV-101 treatment. *See* ¶57 (reproducing charts below).



4

In particular, as to Patient 1 (from the KYSA-1 trial), the Offering Documents and charts showed that Patient 1's UPCR, C3, and C4 levels through roughly "Day 140" (i.e. the 140th day after being dosed), and anti-dsDNA levels through Day 120 had *all* improved to levels not associated with LN disease activity. ¶¶57, 59-61.

Likewise, the Offering Documents charts showed that Patient 2 (also from the KYSA-1 trial) was also significantly benefiting from KYV-101, with anti-dsDNA, C3 and C4 complement levels through roughly Day 95 (*i.e.* the 95th day after treatment) all having improved to levels *not* associated with LN disease activity. ¶62. Patient 2's UPCR data from roughly post-treatment Day 30 to Day 67 also showed a dramatic improvement, with their UPCR falling by roughly 85% to (and almost below) the 0.5 threshold for active LN. *See also id.* (touting how Patient 2's "UPCR improved from 3.4 at baseline to 0.6 by around day 30").

In short, the Offering Document data for both Patients 1 and 2 showed (a) beneficial declines in UPCR levels to close to or below the 0.5 threshold for active LN disease; (b) beneficial declines in anti-dsDNA to levels below the LN activity threshold; and (c) beneficial increases in C3 and C4 to levels above the LN activity threshold. Instead, all of this data reflected clear improvement, and none showed that any patient had relapsed. ¶63.

**C. By the IPO, The Condition of Two of Three Patients Had Materially Worsened**

Unbeknownst to investors, however, two of the three patients in Kyverna's clinical trials had actually experienced relapse or other material adverse developments as of the IPO. First, as Kyverna would disclose on June 14, 2024 at the EULAR conference, Patient 1's initially promising response to the KYV-101 had abruptly reversed. *See* ¶77. This information was disclosed in part in the three charts reproduced below, which showed Patient 1's anti-dsDNA levels and C3 and C4 complement levels through roughly Day 270 (with the added vertical yellow highlighting reflecting the period from the last "as of" day reported in the Offering Documents to the last "as of" date for samples collected before the IPO). As these charts show, the beneficial decline in Patient 1's anti-dsDNA reported in the Offering Documents had reversed course after Day 120, and had increased by roughly Day 165 to over 250 IU/mL—more than twice the last level reported in the Offering Documents. ¶¶70, 77, 79:

PL.'S OPP. TO DEFS' MOTS. TO DISMISS                    CASE NO. 5:24-cv-08869-PCP





Likewise, by Day 165, Patient 1's C3 and C4 levels had *worsened* to below that patient's pre-treatment levels. ¶¶70, 77, 79. Moreover, because Patient 1 had been dosed in July 2023, their Day 165 data reflected Patient 1's condition based on blood and urine samples taken as of January 12, 2024 at the latest—*which was nearly four weeks before the IPO*. ¶70 & n.11.

In addition, Kyverna admitted at EULAR that Patient 1, after "initially" having a good response "with the ability to discontinue immunosuppressant[s]," had suffered a relapse "between [treatment] months five and six," when "her disease recurred, and she was placed back on immunosuppressants." ¶¶66, 75. *See also* ¶68 (former Kyverna project manager in clinical operations for the KYSA-1 trial confirming that Patient 1 was dosed with KYV-101 in July 2023). In short, because Patient 1 had begun treatment in July 2023, and had relapsed (per Kyverna's own statements) "between months five and six" after receiving treatment, Patient 1's sharp decline and relapse happened in either December 2023 or January 2024—*i.e.*, at least a full week (if not as much as two months) *before* the February 7, 2024 IPO. ¶67 & n.10. The data that Kyverna presented at EULAR also included a chart showing that Patient 2's UPCR level had experienced a *five-fold worsening* from just above 0.5 on Day 67, the last day reported in the Offering Documents for that patient's UPCR, to 2.5 (a level associated with high LN activity, on Day 95. *See* ¶¶62, 80. The chart below (*see* highlighted line) shows how abruptly the initially reported favorable had reversed:



However, although this adverse Day 95 UPCR data had *not* been reported in the Offering Documents, Patient 2's "Day 95" had occurred before the IPO, because the Offering Documents *had* reported anti-dsDNA, C3 and C4 data for this same patient as of Day 95. ¶81.

### D.    Market Reaction to Kyverna's June 14, 2024 Disclosures

When Kyverna disclosed the adverse clinical data at the EULAR conference on June 14, shocked markets reacted swiftly, with Kyverna shares plummeting nearly 45% over the next two trading days (falling from $14.44 to just $7.89 per share, or less than 75% of their IPO price). ¶¶6-8, 82. Analysts such as JP Morgan described the news about Patient 1 as "a surprise," and attributed the sell-off to the bad news from the EULAR conference. *Id.*

### LEGAL STANDARD[3]

To avoid dismissal, a plaintiff need only allege enough facts to state a plausible claim for relief, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *i.e.* sufficient facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In addition, on a motion to dismiss, courts must accept a complaint's factual allegations as true and construe them in the light most favorable to the plaintiff. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 698 (9th Cir. 2021).

"The Supreme Court has recognized that §11 places a relatively minimal burden on a plaintiff." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013), citing *Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983). To plead §11 or §12(a)(2) claims, a plaintiff need only plausibly allege that the offering materials contained a material omission or

---

[3] In quoted cases, internal cites are omitted, and emphases is added, unless otherwise stated.

PL.'S OPP. TO DEFS' MOTS. TO DISMISS                    CASE NO. 5:24-cv-08869-PCP

misrepresentation, such that "it would have misled a reasonable investor about the nature of [their] investment." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005); *In re Ubiquiti Net., Inc. Sec. Litig.*, 669 F. App'x 878, 879 (9th Cir. 2016). A fact is material if a "reasonable investor would have viewed [it] as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 44 (2011). Once a materially misleading statement or omission is shown, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Huddleston*, 459 U.S. at 382, although non-issuer defendants may avoid liability if they can carry their burden of proving an affirmative due diligence defense). *Id.* at 381. A §11 plaintiff need not plead or prove reliance, loss causation, or that any defendant acted with scienter. *Hildes*, 734 F.3d at 859-60.

## ARGUMENT

### A. Rule 9(b) Does Not Apply To These Claims

As a threshold matter, because scienter is not an element of a §11 claim, the AC is subject only to Rule 8(a)'s notice pleading standards. However, much of Defendants' Motion rests on the contrived notion that the AC somehow "sounds in fraud," and must therefore be dismissed for failing to allege "fraud" with particularity. MTD at 8-10. Defendants are wrong.

#### 1. The Complaint Does Not "Sound in Fraud"

In the securities context, the "sounds in fraud" doctrine, with rare exception, is limited to cases where a plaintiff alleges both true securities fraud claims under §10(b) of the Exchange Act (which requires proof of scienter) and strict liability/negligence claims under §§11 or 12(a)(2) of the Securities Act. In such cases, courts "examine the language and structure of the complaint, [to determine] whether it allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis" for both the fraud and non-fraud based claims, such that it is appropriate to assess the overlapping falsity allegations of both under Rule 9(b). *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009).

But here Plaintiff alleges no fraud claim under §10(b), and brings only non-fraud §§11 & 12(a)(2) claims. Defendants' reliance on cases such as *In re Rigel Pharma., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012) (applying 9(b) where §10(b) and §11 claims were based on

8

the same misrepresentations), and *In re Stac Elects. Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996) (same) is thus misplaced. *Compare In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 546 (N.D. Cal. 2009) (noting paucity of decisions this Circuit that applying Rule 9(b) to §11 claim where underlying conduct was not also alleged to have constituted §10b fraud).

To be sure, *Charles Schwab* noted that Rule 9(b) could apply to §11 & 12(a)(2) claims—but recognized that this would occur only in the uncommon circumstance where "the conduct alleged necessarily sounds in fraud." 257 F.R.D. at 546. But here, as in *Schwab*, the "necessarily" test fails when non-fraud explanations are at least possible. *Id*. at 546 (rejecting defendant's argument that it could not have "systematically" misstated information about a fund offering (as plaintiffs alleged) "without doing so intentionally," as the misstatements could also have been due to, *e.g.*, internal control breakdowns due to negligence); *see also Safron Cap. Corp. v. Leadis Tech., Inc.*, 274 F. App'x 540, 540–41 (9th Cir. 2008) (Rule 9(b) did not apply to §11 claims that "did not allege facts necessarily constitut[ing] fraud").

Tellingly, Defendants' only cited case applying Rule 9(b) in an action that, as here, alleged only Securities Act claims, is a 20-year-old opinion from another district that appears to have gone uncited by any other court since it was issued. *See In re Orange 21 Inc. Sec. Litig.*, 2006 WL 8455352 (S.D. Cal. Mar. 30, 2006). And there, the court applied Rule 9(b) only after finding that "[i]f Plaintiffs meant to base their claims on a theory of negligence, such allegations are not present in the Complaint as presently pled." *Id*. at 3. By contrast, Plaintiff here not only repeatedly disavows any allegation of fraud, ¶¶10, 103, but *expressly* pleads that Defendants (while also subject to strict liability, *see* ¶¶1, 105-07) "acted negligently in preparing the Offering Documents." ¶108; *see also* ¶¶10, 116. In short, whatever limited precedential value *In re Orange* may have, this case is readily distinguished.

### 2. None of Defendants' Cherry-Picked Language Comes Close to Showing That the Complaint "Necessarily" Sounds in Fraud

Ultimately, in arguing that Plaintiff necessarily alleges fraud, Defendants rely on what *they* describe as the AC's four "essential allegations." But they intentionally misread the AC.

First, Defendants say that Plaintiffs allege fraud by alleging that Defendants "needed" positive clinical results "to have …. a successful IPO." MTD at 9, citing ¶64. But this is

9

simply a statement of fact that confirms the materiality of the Offering Documents' misleading incomplete presentation of the clinical data.  Defendants' alternative insinuation that Plaintiff somehow necessarily alleged *fraud* in this regard is based entirely on Defendants' sly use of a term—"concealed"—that appears **nowhere** in the Complaint.  *Cf.* MTD at 9.

Second, Defendants again falsely suggest that Plaintiff alleges fraudulent concealment when they mix the AC's actual allegation—that top Kyverna officials "locked down" and held "tightly" news of Patient 1's relapse (MTD at 9, citing ¶¶68, 69)—with *Defendants'* addition of the term "concealed."  *Id.*  Defendants cannot add their own words to the AC to convert an allegation about limited internal dissemination of data into a claim of fraud.  Indeed, it may be that those top officers only discovered the material omissions after-the-fact (and then decided to delay disclosing more data until the EULAR conference in June).  Such a "sounds in negligence" theory would be fully consistent with Plaintiff's §11 and §12 claims as pled.

Defendants also undermine their own position by repeatedly arguing that their withholding of information was due to their "audit and verification procedures." MTD at 5, 12, 16-19.  But if Defendants' explanation is proved correct, then this action will simply turn on whether their invocation of internal procedures somehow justified their failure to disclose the best available data.  And they cite no case suggesting that, in this strict liability and negligence case, the answer to such a question would turn on whether Defendants acted in bad faith so as to convert this action into one whose gravamen is somehow fraud.  In sum, Defendants' posited "excuse theory" only further illustrates how this case is fairly framed as one based on strict liability and/or negligence, and not as one that "necessarily" sounds in fraud.

Third, and for similar reasons, the AC's allegations that the data was "known **and/or** available to Defendants" (MTD at 9, citing ¶¶85-88) is unavailing.  Simply stated, that defendants knew or should have known of the negative results, without allegations of fraudulent intent, do not make Plaintiff's §11 claims "sound in fraud." *See, e.g.*, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) (where Defendants allegedly had "knowledge of [the] facts" in determining whether

10

to conduct additional testing, the court inferred that they "made a good faith but mistaken determination").

Last, that the adverse data was "belatedly disclosed" (*i.e.* after the IPO), (MTD at 9, citing ¶73) is of no moment, as such allegations simply speak to when the disclosure occurred, and have nothing to do with anyone's intent.  Of course, curative disclosures in Securities Act cases will ***always*** occur post-offering, as otherwise the offering materials' disclosures would have been adequate.  But because the Complaint "neither specifically alleges fraud, nor does it allege facts that ***necessarily*** constitute fraud," it does not sound in fraud.  *In re Merix Corp. Sec. Litig.*, 275 F. App'x 599 (9th Cir. 2008) (emphasis in original).

### 3.   In Any Event, The Complaint Alleges Falsity With Ample Particularity

Finally, even if the "sounds in fraud" doctrine somehow triggered Rule 9(b), this would not create a scienter requirement for Securities Act claims, but would simply mean that the *falsity* element of Plaintiff's claims would need to satisfy Rule 9(b). *See*, *e.g.*, *Thant v. Rain Oncology Inc.*, 2025 WL 588994, at *3 (N.D. Cal. Feb. 24, 2025) (sustaining §11 claims where "who, what, when, where, and how" standard was met as to alleged misrepresentations and omissions under Rule 9(b), but dismissing §10(b) claims for inadequately pled scienter).[4]

Defendants make no serious effort to argue that the "who, what, when, where, and how" test is not met as to the misrepresentations and omissions here.  The statements were made by the IPO participants in, and signatories to, the Offering Documents, which became effective on February 7, 2024.  ¶¶1, 17-28, 30-37.  The AC also contains a separate section that identifies the specific prose comments, charts (reproduced above), omissions, and defective "risk factor" statements at issue, and explains "how and why" they rendered the Offering Documents untrue, incomplete and/or misleading.  ¶¶84-94.  Thus, even if Rule 9(b) applies (and it does not), the AC's falsity allegations are pled with ample particularity.

---

[4] Although immaterial here, Defendants do not cite Rule 9(b)'s familiar "who, what, when, where, and how" standard, but quote heightened pleading standard language that applies only to *Exchange* Act claims.  *See* MTD at 9, citing *In re Arrowhead Pharms., Inc. Sec. Litig.*, 782 F. App'x 572, 574 (9th Cir. 2019), a case that in turn notes that the quoted text is *not* from Rule 9(b), but from 15 U.S.C. §78u–4(b)(1)—*i.e.,* is from a statutory provision that was added to the Exchange Act in 1995, but that has no corresponding provision in the Securities Act.

11

**B. The Complaint Does Not Constitute Impermissible "Puzzle Pleading"**

Defendants next argue that the Complaint must be dismissed because it is "puzzle pleaded," meaning "plaintiffs have left it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons that they are false and misleading." MTD at 10 (citing *Primo v. Pac. BioSciences of Calif., Inc.*, 940 F. Supp. 2d 1105, 1111 (N.D. Cal. 2013)). This argument is nonsense.

As discussed above, the AC specifically identifies each statement and omission at issue, and explains how they rendered the Offering Documents materially inaccurate, misleading and incomplete. Courts dismiss "puzzle pleadings" in extreme cases where they are so verbose and convoluted "that [d]efendants are incapable of figuring out what statements are alleged to be false." *Boston Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *5 (N.D. Cal. Aug. 7, 2020); *see also In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1553-54 (9th Cir. 1994) (113-page complaint that "ramble[d] through long … quotes from defendants' public statement[s]," suffered from "poor draftsmanship", and was "cumbersome almost to the point of abusiveness," was nevertheless not an impermissible puzzle pleading). Here, Defendants make no credible claim that they (or this Court) are "incapable" of grasping the claims asserted, which are succinctly pled in the 35-page AC. *Compare GlenFed*, 42 F.3d at 1554 ("cumbersome" complaint not puzzle-pled) and *United Assoc. Nat'l Pens. Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 949 (D. Ariz. 2024) (324-page complaint not puzzle-pled as it "identifies specific [actionable] statements and sets forth detailed reasons … [why] each statement [is allegedly] false or misleading").[5]

While seeking to strike the AC as a whole, Defendants actually cite only *one* purported example of "puzzle pleading," when they take issue with its cite to a purported "30-line block

---

[5] *See also Karinski v. Stamps.com, Inc.,* 2020 WL 281716, at *9 (C.D. Cal. Jan. 17, 2020) (complaint not puzzle-pled where it "quotes specific statements and then explains in the subsequent paragraphs why they are allegedly false"); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *7 (D. Or. June 27, 2017) (same); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *9 (C.D. Cal. June 9, 2016) (same).

quote" from the Offering Documents.  MTD at 11.[6]  First, they ignore that the quoted material represents two roughly 16-line quotes, rather than a single "30-line block quote."  Second, their brief conveniently relegates to a footnote how (a) the AC uses emphases to identify the parts of each "risk warning" that misled, *see Uber*, 2020 WL 4569846, at *5 (plaintiff "emphasize[d] the portions of [the Offering Documents alleged] to be false or misleading"), and (b) ignores how the AC specifically pleads *why* these highlighted excerpts misled (namely, because the cited "risk" was no longer a risk, as it had already come to pass). ¶¶91-94; *see also In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 950 (9th Cir. 2023). In other words, the AC identifies the specific risk warnings alleged to be actionable—notably that "clinical outcomes may materially change" and that "adverse differences between preliminary or interim data and final data" could adversely affect the Company (*id.*)—and alleges how those risks (all of which relate to adverse developments in clinical data) had *already* materialized by the time of the IPO.  *See* ¶¶73-81 (alleging that Patient 1 had relapsed and her data had already turned negative prior to the IPO).  *See also* §E.1 below.  And finally, none of Defendants' cited cases even involve situations where the court struck allegedly "puzzle-pled" risk factors.

Defendants are on ample notice of the claims asserted to be able to respond to them. The AC is neither "[over-]long, confusing, [nor] meandering," *cf. Uber*, 2020 WL 4569846 at *5, and even if it were, it "is not so deficient that [d]efendants are incapable of figuring out what statements are alleged to be false." *Id*. at *5.

## C. Accurately Reporting Historical Data Does Not Excuse Omitting Current Material Information

Defendants next assert that Plaintiff's claims must be dismissed because they are based on charts or other statements that simply reflect "accurate reporting of historical data." MTD at 11. But it is horn-book law that literally true statements are actionable when they fail to disclose facts needed to make the statements, when made, not materially untrue or misleading. *Sohovich,* 2025 WL 957895 at *3 (test is not "literal truth" but "ability of the material to

---

[6] Defendants do not, for example, even argue that they cannot discern why the statements (including the incomplete charts) specifically identified at ¶¶86-89 are alleged to be materially untrue, incomplete or otherwise misleading.

13

accurately inform rather than mislead"); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014) (even if statement is not false, it may be misleading if it omits material information); *In re Genius Brands Int'l, Inc. Sec. Litig.,* 97 F.4th 1171, 1183 (9th Cir. 2024) (having chosen to speak on subject of its relationship with a third party, defendants had duty to speak sufficiently completely on subject so as to not mislead); 15 U.S.C. §77k(a) (defendant may not omit material facts "necessary to make the statements therein not misleading").

Courts in this circuit thus regularly hold that where a pharmaceutical company touts positive trial results about a drug, it must *also* disclose facts that materially undercut the company's boosterism so as to avoid misleading investors.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-11 (9th Cir. 2018) (once drug company chose to tout "apparently positive" interim results, it had to disclose material adverse information cutting the other way); *Schueneman v. Arena Pharms., Inc.,* 840 F.3d 698, 705-706 (9th Cir. 2016) ("Once defendants chose to tout positive information to the market, they were bound to do so in a manner that wouldn't mislead investors, including by disclosing adverse information that cuts against the positive information" (citation modified) (quoting *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 987 (9th Cir. 2008))); *City of Birmingham Rel. & Ret. Sys. v. Acadia Pharma., Inc.* 2023 WL 1769810, *4 (S.D. Cal. Feb. 2, 2023) (same); *accord Universal Health Servs., Inc. v. U.S.,* 579 U.S. 176, 188 & n.3 (2016) (rule that "half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations" applies in securities cases) (*citing Matrixx,* 563 U.S. at 44).[7]

Here, the Offering Documents disclosed very favorable data about Patient 1, reporting greatly improved biometrics through Day 140.  But they did not disclose that, as of the IPO, Patient 1's data showed a substantial reversal, as:  Patient 1's anti-dsDNA levels had sharply worsened, to near pre-treatment levels; the patient's C3 and C4 complement levels (having previously improved to healthy levels) had both dropped (worsened) to levels that were not

_____

[7] This rule also comports with the basic principles of the common-law tort of fraudulent misrepresentation. *See e.g.* Restatement (Second) of Torts, § 529, cmt *a* (1977) ("[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue").

14

PL.'S OPP. TO DEFS' MOTS. TO DISMISS            CASE NO. 5:24-cv-08869-PCP

only associated with LN disease, but were even worse than the patient's pre-treatment levels; and the patient had ***relapsed***.  Under the bedrock principles discussed above (but that Defendants simply ignore), the Offering Documents' reporting of Patient 1's response to KYV-101 was patently misleading.  Similarly, its reporting of Patient 2's UPCR data—showing clear improvement through Day 67 but omitting the Day 95 data that showed a ***five-fold*** increase (worsening) in their UPCR level in just 28 days—was similarly misleading. *See* ¶¶86-94.

Defendants next argue that the Offering Documents could not have misled because they advised that the data therein was limited to "that available as of December 31, 2023." MTD at 12.  But this is just a variation on their baseless position that "literal truth" is not actionable even when it omits material adverse facts "cutting the other way" that would plausibly cause an investor's assessment of the "total mix" of information to change.  *See Khoja,* 899 F.3d at 1009; *In re Convergent,* 948 F.2d at 512 (test is not literal truth but whether the material to "accurately inform[s] rather than mislead[s] prospective buyers").  And it is plainly plausible to infer here that investors, given the rules prohibiting selective or otherwise misleadingly incomplete disclosure, would have viewed the reference to data "available as of December 31, 2023" as simply meaning that such data was the most recent available—rather than as some kind of notice that Defendants might try to avoid their duty to fairly portray the results of Kyverna's KYV-101 trial results *as of the IPO* regardless of how bad late-breaking data might be.[8] *See also In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 671 (N.D. Cal. 2021) (whether press release was materially misleading is a "fact-specific" inquiry, and thus dismissal must be denied as long as plaintiffs identified "statements that ***plausibly*** would have misled the investing public") (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)).[9]

---

[8] If, for example, Kyverna had been told prior to the February IPO that all three patients had had even worse deterioration of their LN metrics in January 2024 and were all now near death, would Defendants still argue that the IPO Documents were, as a matter of law, not capable of misleading simply because they "disclosed" that data provided was "as of December 2023"?

[9] Defendants cite numerous cases in support of its argument that "accurate reporting of historical data ***alone*** cannot form the basis for a Section 11 claim." MTD at 11-12 (emphasis added).  Although most of the cited cases are PSLRA cases alleging securities fraud and are inapplicable for that reason alone, the more important point is Plaintiff does not allege the Offering Documents were misleading due to "historical data alone."  As set forth above in

Equally unavailing is their argument that they are immune from liability because investors were told that data in the Offering Documents was "subject to audit and verification procedures" that might result in changes to what was reported. But this case simply does not involve any "changes" to any reported piece of data; rather, it involves the Offering Documents' failure to disclose the most *current data* available as of the IPO.[10]

Defendants also accuse Plaintiff of semantic maneuvers, claiming that he "twists the phrase 'adverse information' or 'adverse events' to fit his narrative." MTD at 13. But Plaintiff uses the term "adverse" in its customary sense meaning of unfavorable. And it is Defendants who twist words by implying that adverse patient data can be deemed materially adverse only if it also qualifies as an "adverse event" under FDA regulations. Indeed, Defendants' own cited precedent squarely rejects attempts to impose technical (as opposed to common sense) constraints on what data qualifies as material. *See Matrixx*, 563 U.S. at 39 (reaffirming, in case involving reports of alleged "adverse" events, that "any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive").[11]

**D. The AC's Allegations that the Omitted Facts Were Available to Defendants Pre-IPO Are All Well-Pled, And Supported On Multiple, Independent Grounds**

Defendants next assert that "Plaintiff has not pleaded facts indicating that any negative data was known or available to Defendants" as of the IPO, because the relevant allegations depend on inadequately pled confidential witness statements. MTD at 12, 13-16. Not so.

---

detail, it was the failure to update that historical data with current data—as required by the securities laws—that rendered the Offering Documents false and misleading.

[10] Defendants also note that Patient 1 was receiving only "half the normal dose of KYV-101." MTD at 13. But they offer no basis for this Court to conclude that this somehow rendered the Offering Documents' omission of the most current (and negative) data about that Patient immaterial as a matter of law. Indeed, given that they deemed the earlier data showing significant improvements material enough to tout, their position that they had no duty to disclose more current data cutting the other way is both contrary to law *and* hypocritical.

[11] Defendants cite *In re Rigel Pharma., Inc. Sec. Litig.,* 697 F.3d 869, 881 (9th Cir. 2012). But it is easily distinguished as it simply held that there was no duty to disclose "a few cases of mild hypertension or…neutropenias that did not require dose reductions," as such data was not inconsistent with its accurate reporting of more serious (and specifically defined) side-effects.

16

### 1. The AC's Easily Meets The Applicable "Plausibility" Test, Even Without Any Confidential Witness Allegations

First, Defendants disregard that the AC is based on far more than CW statements. Notably, the AC cites Kyverna's own admission that Patient 1 had *relapsed* "by between months five and six," ¶¶66, 75, as well as statement in the Offering Documents that Patient 1 had been dosed sometime in July 2023. ¶55. Putting these two statements *by Kyverna* together, the AC has a compelling (let alone plausible) basis to allege that Patient 1 relapsed between December 1, 2023 and January 31, 2024—*i.e. no later than a full week before (and as much as two months before) the February 7, 2024 effective date of the Offering Documents.* ¶67.

Because Defendants' own statements show that Patient 1 relapsed *between one and ten weeks before the IPO,* Defendants must argue that the AC is instead deficient because there is somehow no plausible basis to allege that this negative information was *available* to them before the IPO. However, Rule 8 does not allow courts to check its common sense at the door; rather, it affirmatively requires them to draw all reasonable inferences in Plaintiff's favor. *E.g.,* *Alphabet,* 1 F.4th at 698. Here, as a matter of common sense, one may *infer* that Patient 1 had also been diagnosed as having relapsed at least a week before the IPO, as Kyverna's June 2024 disclosures also noted that Patient 1 had also been placed back on immunosuppressants during the same "between months five and six," pre-IPO time period. And although formal *proof* that Defendants had access to this information pre-IPO is not required at the pleadings, Defendants' offer no persuasive reason to infer that they did based on the facts alleged in the AC.[12]

Moreover, even giving every benefit of the doubt to Defendants and assuming that Patient 1 had not been dosed until the last day of July 2023, the AC also alleges how Patient 1's "Day 165" could not have been later than January 12, 2024—or 3½ *weeks* before the IPO. ¶¶78-79. Again, drawing reasonable inferences in Plaintiff's favor, the Court also may plainly infer that the results of the analyses of Patient 1's Day 165 blood and urine samples were available to Kyverna before (if not weeks before) the IPO. That the analyses of the Day 165

---

[12] For example, some clinical trials are conducted on a fully "blinded" basis that keeps sponsors in the dark about their results until the trial is over. But interim data from the KYSA trials was *obviously* available to Kyverna, as Kyverna presented interim data in the Offering Documents as well as updated interim data at the June EULAR conference. ¶¶57, 73-80.

17

data were likely available weeks before the IPO also further strengthens the already strong inference that Patient 1 was diagnosed as having relapsed *at least* a week prior to the IPO.

The factual allegations as to the omitted data for Patient 2 are equally strong (let alone plausible). For example, the AC alleges that the Offering Documents reported favorable C3, C4 and anti-dsDNA levels for Patient 2 as of that patient's "Day 95," but omitted their sharply negative Day 95 results for UPCR. ¶¶57, 62, 81. Kyverna also does not dispute that Patient 2's Day 95 occurred no later than December 31, 2023. ¶81. Drawing reasonable inferences in Plaintiff's favor, the Court may also readily infer that the results of the analyses of Patient 2's Day 95 samples—samples which were known to have been taken *more than five weeks before the IPO*—were also almost certainly available to Kyverna *weeks* before the IPO.

*Might* Defendants eventually be able persuade a jury that, despite these well-pled allegations, Kyverna lacked pre-IPO access to the omitted data (and that the other defendants thus could not have found it through due diligence? That seems most unlikely. But that is a matter for discovery and trial, as the AC's allegations plainly suffice at the pleading stage.

### 2. The Cited Confidential Witnesses Further Support the AC's Well-Pled Allegations of Materially Misleading Statements and Omissions

As shown above, Kyverna's (and by extension the other Defendants') access to the omitted information is amply pled from just Kyverna's own statements (including the Offering Documents) and the reasonable inferences that can be readily drawn from them. Yet the AC goes beyond by *also* citing corroborating confidential former employee ("FE") sources.

In particular, FE3—the Clinical Trial Manager at Kyverna from August 2023 to June 2024 who "oversaw operations for the KYSA-1 trial" and whose duties included "ensur[ing] that data collected from trial patients by the study sites would be transmitted to Kyverna in a prompt and timely manner" (¶72)—provided clear, detailed and damning corroboration of how Kyverna did in fact have ready and prompt access to patient data. As the AC states:

> According to FE3, patient blood and urine samples that were tested for relevant biomarker results would be taken at the clinical trial study sites and would then be processed by a local lab, which would typically have the lab results available *within 24 hours* of having received the patient samples from the site. Available [lab] test results were recorded in the patient's electronic medical record ("EMR") and could be accessed by the clinical trial study site coordinator. The site coordinator would

18

then enter the test results from the EMR into Kyverna's Electronic Data Capture System ("EDC System"), where it would be available to Kyverna personnel to *immediately* review electronically from the same EDC System. Although it could take roughly a week for a site coordinator to enter the relevant patient test data into the EDC System, FE3 stated that it was not uncommon for Kyverna to call the study site coordinator to ask for information to be entered more quickly if Kyverna needed it. Accordingly, patient test results were effectively available to Kyverna immediately after they were recorded in the EMR, even in those circumstances where Kyverna might have to call or otherwise contact the sites to make sure that the information posted on the EDC System was the most complete available.

¶72. In sum, FE3 confirmed exactly the kind of data collection and reporting system whose existence could be readily inferred from a review of the AC based on common knowledge and common sense (*see* immediately preceding section)—namely, a system in which (a) lab results were typically reported to the trial site with 24 hours, and (b) then entered within a matter of days by the trial site into a computer system that was readily accessible by Kyverna, but with the proviso that Kyverna personnel could (and occasionally would) contact the site directly if it wanted to confirm that what was entered in the system was the most current available. *Id.*

In response, Defendants observe that the Ninth Circuit applies a two-part test to assess whether and when confidential witness allegations should be considered. Under that test:

First, the confidential witnesses … must be described with sufficient particularity to establish their reliability and personal knowledge…. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of [falsity].[13]

MTD at 13 (quoting *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 995 (9th Cir. 2009)); *see also Daou*, 411 F.3d 1015. They then claim that FE3 is not adequately described, and characterize FE3's statements as "vague and speculative assertions," or mere "opinions" as to when test results "should have been made available." MTD at 15.

Defendants must be reading a different complaint. Here, the AC describes FE3 not as some random former employee, but as the Kyverna "Clinical Trial Manager" who, at all relevant times, was directly responsible for "overs[eeing] operations for the KYSA-1 trial"—

---

[13] Actually, Defendants artfully paraphrase *Zucco*, a §10b case that dealt with "confidential witnesses **whose statements are introduced to establish scienter"** and that held, in that context, that such statements must also be "indicative of **scienter**." *Zucco*, 552 F.3d at 995 (bolded material omitted from Defendants' quote). Although scienter allegations are subject to the PSLRA's heightened "strong inference" pleading standard, *Zucco* creates no special pleading standard for CW testimony that is used to corroborate *non*-fraud-based allegations.

PL.'S OPP. TO DEFS' MOTS. TO DISMISS                    CASE NO. 5:24-cv-08869-PCP

the trial in which both Patients 1 and 2 were enrolled—and whose duties specifically included "ensur[ing] that data collected from trial patients by the study sites would be transmitted to Kyverna in a prompt and timely manner." ¶72. The contrast to cases relied on by Defendants, such as *Zucco*—where a low-level human resources employee "had no firsthand knowledge" and was not even employed "during the time in question," *see* 552 F.3d at 996, could hardly be more stark. Instead, by any measure, the AC plainly describes FE3 "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Daou,* 411 F.3d at 1015.

Defendants' efforts to downplay FE3's statements as mere "conclusory assertions" or "opinion" (MTD at 15) are equally baseless. To the contrary, as a review of the AC makes clear, FE3's statements were a *factual description* of (1) how the relevant data collection, entry and access processes (using the specifically identified "EMR" and "EDC" systems) *actually worked* during the relevant time period, and of (2) Kyverna's *actual ability* (namely, whenever it wanted) to confirm directly with the trial site that Kyverna had the most current patient data information (and if not, to ensure that the most current data was promptly uploaded so it *would* have the most current information).[14]

The other CWs, like FE3, are also described with the requisite particularity, under *Daou,* to support the probability that persons in their respective positions would possess the information alleged. For example, as a "project manager in clinical operations for the KYSA-1 trial during the summer of 2023 through mid-2024," FE1 could be expected to know that Patient 1 was in fact "treated with KYV-101 in July 2023." ¶68. FE2's statement to substantially the same effect is also well-pled, but is hardly worth arguing about as both the AC's reliance on the Offering Documents and FE1 already establish the same point.

---

[14] Defendants cite *Huang v. Higgins,* 2019 WL 1245136 (N.D. Cal. Mar. 18, 2019), as grounds for disregarding FE3's statements, citing a need for more "specific[ity] in time, context, and details." *Id.* at *7. But the CW testimony in *Huang* was used to allege scienter, which focused on witnesses direct communications with named defendants. *Id.* at *7, *11. Here, by contrast, the relevant factual allegations are not what FE3 was told by any named defendant, but FE3's description, as the manager responsible for overseeing operations for the KYSA-1 trial, of how easy it was for Kyverna to access current data from that trial.

PL.'S OPP. TO DEFS' MOTS. TO DISMISS                    CASE NO. 5:24-cv-08869-PCP

### E. The Offering Documents' Stated Risk Factors Were Affirmatively Actionable Under *Alphabet,* And Also Separately Actionable Under Item 105

Defendants next argue that there was nothing wrong with the Offering Documents' risk disclosures.  They are again wrong—for two separate and independent reasons.

#### 1.    The Offering Documents' Cited Risk Factors Were Actionably Misleading

The AC squarely alleges how the Offering Documents' risk warnings, in addition to being inadequate under Item 105, contained at least two actionable misleading statements.

As alleged at ¶91, the IPO Documents "warned" that (a) "[o]ur product candidates are susceptible to the risks of failure inherent at any stage of product development, including the appearance of unexpected adverse events;" and that (b) "[i]nterim data from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as … more patient data becomes available", and that "[a]dverse differences between preliminary or interim data and final data could significantly harm our business prospects."  However, such "warnings" were patently misleading because their contingent language failed to disclose that, by the date of the IPO, the reported interim clinical trial data for two of the three KYSA had *already* materially changed for the worse, and an undisclosed adverse event (namely Patient 1's relapse) had *already* occurred.  ¶¶92-94.

In this Circuit, risk disclosures that "speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-05 (9th Cir. 2021) (to merely warn of security breach risk was misleading where "bug" already existed); *accord In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023) (risk disclosure that described "third parties improperly accessing and using Facebook users' data as purely hypothetical" was materially misleading where such improper access and use had already occurred).  Defendants do not even try to argue that Plaintiff's *Alphabet* claims based on materially misleading risk disclosure statements are inadequately pled.

#### 2.    Separately, The Offering Documents Also Violated Item 105

Item 105 of Regulation S-K requires that S-1 registration statements include "a

21

discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).  Accordingly, a company also exposes itself to liability for violating Item 105 "where the 'risk factors' reported in its Registration Statement had already materialized by the time of its IPO." *Felipe v. Playstudios Inc.*, 2024 WL 1380802, at *13 (D. Nev. Mar. 31, 2024); *see also Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *7 (N.D. Cal. Aug. 7, 2020); *United Assoc. Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 988 (D. Ariz. 2024) (Item 105 violation alleged where defendants cautioned only that violations of laws or regulations "could result in penalties," but failed to disclose issues re compliance with title and registration requirements); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 769 n.4, 776 n.7 (N.D. Cal. 2020) (sustaining Item 105 claims, despite disclosures of "hypothetical risk," where "severe risk" and "present reality" required disclosure).

Defendants' cases are inapposite. In *In re Pivotal Sec. Litig.*, 2020 WL 4193384 (N.D. Cal. Jul. 21, 2020), plaintiffs, unlike here, did not allege that risks described in the offering materials had already materialized, but only that certain risks were not mentioned or adequately described. *Id.* at *8.  And in *Golubowski v. Robinhood Mkts., Inc.*, 2023 WL 1927616 (N.D. Cal. Feb. 10, 2023), the offering documents did not describe the risk at issue as a mere possibility, but "expressly disclosed that it anticipated declines in KPI growth." *Id.* at *8.

**F.  Plaintiff Asserts Valid Claims for Violations of Item 303**

Regulation S-K Item 303 requires offering documents to "[d]escribe any known ***trends or uncertainties*** that have had or that are reasonably likely to have a material favorable or unfavorable impact" on a registrant's business. 17 C.F.R. §229.303(b)(2)(ii). A disclosure duty exists where a trend, demand, commitment, event, or uncertainty is both (1) presently known to management[15] and (2) reasonably likely to have material effects on the registrant's financial condition or operating results. *Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1296 (9th Cir. 1998). Under Item 303, even if a defendant cannot determine whether an *event* or *uncertainty*

---

[15] Because Item 303 claims are a subspecies of §11, and do not require proof of any intent to defraud, the "known to management" requirement need only satisfy Rule 8(a)'s notice pleading standard.  *NVIDIA*, 768 F.3d at 1055-56 (citing *Panther Partners Inc. v. Ikanos Comms, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012); *Uber*, 2020 WL 4569846, at *7.

22

is likely to occur, disclosure is still required unless the defendant affirmatively determines that no material effect on the company is reasonably likely to occur.   Mgmt's Discussion & Analysis of Fin. Condition & Results of Operations, SEC Rel. No. 34-26831, 54 Fed. Reg. 22427, 22430 (May 24, 1989).

Aside from quibbling over whether the omitted patient data meets the definition of a "*trend*" under Item 303, Defendants make no attempt to argue that they meet this rigorous disclosure standard.  And they plainly cannot.  Plaintiff alleges that the Offering Documents omitted materially unfavorable information known to management at the time of the IPO regarding the viability of Defendants' only drug candidate approved for clinical trials.  Specifically, Defendants reported positive biomarker data showing initial improvement in LN symptoms after treatment with KYV-101 while omitting negative data showing a deterioration of conditions for two patients, including that Patient 1 had relapsed.  Because Defendants do not and cannot assert that this negative data concerning KYV-101 would have had no material effect on Kyverna's business, Plaintiff has plausibly pleaded a violation of Item 303.

Defendants simply ignore that, consistent with *Steckman,* Item 303's disclosure obligation is not limited to "trends," but also encompasses "events or uncertainties."  *See* SEC Rel. No. 34-26831, 54 Fed. Reg. at 22430. Moreover, the omitted negative clinical data did not, as Defendants assert, consist of a single, "isolated" piece of information (MTD at 16); rather, the Offering Documents omitted *multiple* negative data points, for two of the three patients, including information that Patient 1 had relapsed and suffered "disease recurrence." *See* §C *supra*.  And even if Item 303 only applied to "trends," Defendants' argument (MTD at 16) that the time period covered by the data was too short to constitute a "trend" as a matter of law is unpersuasive, as "case law is far from settled regarding the length of time necessary to constitute a trend" for Item 303 purposes. *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1066 (M.D. Tenn. 2022). The only case Defendants cite, *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010), and the cases it relies on, concern transient changes in rates of financial performance (*e.g.* foreclosure rates, operating income, commodity prices, sales). *Id.* at *10. Such business ups and downs are simply not

analogous to dramatic drops, to levels associated with major disease, in a drug trial involving human life, where such reversals are construed by investors as signaling that the drug actually has no chance of ever being approved for the previously hoped-for use.

Whether viewed as an actionable failure to disclose data that indicated reversal of a prior "trend," or as a failure to disclose a highly material "event or uncertainty" as to KYV-101's (in)effectiveness, the claim turns on "fact-specific determination[s] that should ordinarily be assessed by a jury."  *In re Stac Elecs. Sec. Litig.*, 89 F. 3d at 1405; *accord Sundaram v. Freshworks Inc.*, 2023 WL 6390622, at *7 (N.D. Cal. Sept. 28, 2023) (plausibility is pled even where "[m]ore facts are needed" to decide Item 303 claim).

### G. Plaintiff Need Not Himself Have A §12(a)(2) Claim In Order To Bring Such Claims On Behalf of Absent Class Members Who Do Have Such Claims

Defendants also contend that, because Plaintiff did not purchase directly in the IPO and thus lacks standing to bring his own §12(a)(2) claim, that claim must be stricken from the AC. But Defendants confuse cases where a plaintiff did not purchase the securities at issue, either "in" or "traceable to" an IPO (and thus could not bring any 1933 claims at all), with cases where a lead plaintiff may not personally have every claim that absent class members have, but does have at least a §11 claim based on his purchase of the same securities as the class.

Instead, courts routinely recognize that the PSLRA does not require that a lead plaintiff in a consolidated securities action have standing to bring every available cause of action alleged by a class. *See Hevesi v. Citigroup Inc.,* 366 F.3d 70, 82 (2d Cir. 2004); *accord In re Global Crossing Ltd. Sec. Litig.,* 313 F. Supp. 2d 189, 204-05 (S.D.N.Y. 2003) ("[N]othing in the PSLRA requires that the lead plaintiffs have standing to assert all of the claims that may be made on behalf of all of the potential classes and subclasses of holders of different categories of security at issue in the case.").  Accordingly, where a lead plaintiff is not personally situated to assert every class claim, courts permit other suitable class members to be named as additional plaintiffs or class representatives, as needed. *See Fishbury, Ltd. v. Connetics Corp.*, 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006) ("[T]his deficiency can be corrected by the designation of other members of the purported class as named plaintiffs or class

24

representatives"). Some have even held that it is a lead plaintiff's responsibility to try to do so. *In re Block, Inc. Sec. Litig.*, 2024 WL 639470, *5 (S.D.N.Y. Feb. 15, 2024).

Defendants' authorities are off-point as they address the standing of a lead plaintiff who never bought the securities at issue, rather than the right of a lead plaintiff to seek recovery on behalf of all class members. *See In re Wells Fargo Mortg.-Backed Certificates Litig.,* 712 F. Supp. 2d 958, 965 (N.D. Cal. 2010). Instead, in Defendants' cited cases, courts dismissed the §12 claim solely as to plaintiffs who lacked direct-purchaser standing—but none held that such claims could not be maintained on behalf of a class simply because the lead plaintiff could not assert it personally. Defendants' arguments thus raise at most a premature issue concerning typicality and adequacy under Rule 23, rather than a standing defect that warrants striking the claim from the pleadings. *See Ralston v. Mortg. Inv. Group, Inc.,* 2011 WL 4081696, at *9 (N.D. Cal. Sept. 12, 2011) ("that some class members purchased their loans from originators other than [the defendant] does not deprive [the lead plaintiff] of standing to assert claims on their behalf; … that fact instead goes to questions of typicality and adequacy of representation"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1157 (C.D. Cal. 2008).

## H. The Section 15 "Control Person" Claims Are Adequately Pled

Defendants attack the AC's §15 claims only on the ground that no underlying §§11 and 12(a)(2) claims have been adequately pled. However, given that the underlying claims are well-pled, their argument for dismissing the §15 claim must also be denied.

## I. Response to Defendants' Request for Judicial Notice

Finally, Defendants request judicial notice of certain exhibits, including the Offering Documents and an analyst report. Plaintiff does not object to noticing these documents for their contents, subject to the limitations of *Khoja,* 899 F.3d at 999-1003, 1014-15 (courts should not assume *truth* of contents of incorporated documents to dispute facts alleged in complaint, nor use them to judicially notice disputed facts).

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion should be denied in its entirety.

Dated: August 18, 2025

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
*s/ John T. Jasnoch*
John T. Jasnoch (CA 281605)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508
jjasnoch@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
William C. Fredericks (*pro hac vice*)
Susan Hu (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
wfredericks@scott-scott.com
shu@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall
Andrew Brown
Adam Rosen
2049 Century Park East, Suite 2460 Los
Angeles, CA 90067
Tel: 310-301-3335
Fax: 310-388-0192
brian@schallfirm.com
andrew@schallfirm.com
adam@schallfirm.com

*Co-Lead Counsel for Plaintiff Clement Mathys and the Class*

PL.'S OPP. TO DEFS' MOTS. TO DISMISS          CASE NO. 5:24-cv-08869-PCP