United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CLEMENT MATTHYS,
Plaintiff,

v.

KYVERNA THERAPEUTICS, INC., et al.,
Defendants.

Case No. 24-cv-08869-PCP

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. Nos. 54, 55

In this putative securities class action, plaintiff Clement Matthys alleges that defendant Kyverna Therapeutics, Inc., its executives, and the underwriters of its initial public offering (IPO) made materially false or misleading statements or omitted material factual information from required disclosures in advance of Kyverna's 2024 IPO. Matthys claims that the alleged statements and omissions violated §§ 11, 12(a)(2), and 15 of the Securities Act. Defendants now move to dismiss this action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants defendants' motion and dismisses Matthys's amended complaint with leave to amend.

**BACKGROUND**

Kyverna is a clinical-stage biopharmaceutical company focused on developing cell therapies to treat patients with autoimmune diseases.[1] The company conducted its IPO in February 2024. In connection with the IPO, Kyverna filed a registration statement with the Securities and Exchange Commission (SEC) on January 16, 2024, which became effective on February 7, 2024. Kyverna also filed a prospectus with the SEC on February 8, 2024.[2]

---

[1] The Court accepts the allegations in Matthys's amended complaint as true for the purposes of this Rule 12(b)(6) motion.

[2] Defendants request that the Court take judicial notice of the original and amended registration statement and the prospectus, as well as a post-IPO analyst report by J.P. Morgan and a report on

At the time of its IPO, Kyverna had no commercial products on the market, and its lead product candidate (KYV-101) was in an early stage of clinical development. KYV-101 "involves a single infusion of genetically modified white blood cells called CD19 CAR T-cells, which are engineered to target and eliminate specific B-cells in the body that contribute to abnormal immune activity seen in autoimmune diseases." Prior to the IPO, Kyverna had received approval from the Food and Drug Administration (FDA) to test KYV-101 on patients with lupus nephritis and had undertaken two clinical trials. The first trial, KYSA-1, was based in the United States and had enrolled two patients. The other, KYSA-3, was based in Germany and had enrolled only one patient.

Early results from the trials were promising. The first clinical-trial patient (Patient 1) had been dosed as part of the KYSA-1 trial sometime in July 2023. Over the next 120 days, Patient 1 exhibited significant improvements in each of the four key biomarkers associated with lupus nephritis.[3] The second patient in the KYSA-1 trial (Patient 2) similarly exhibited improvements—the trial reported positive trajectories in three of four key biomarkers for 95 days following treatment, and in the fourth biomarker for 67 days following treatment. The patient in the KYSA-3 trial also produced positive data, though that patient's later dosing date meant that only preliminary data was available at the time of the IPO.

Kyverna touted these early clinical-trial results in its offering documents (i.e., the registration statement and prospectus). And in light of these early results, the offering documents

---

the historical price of Kyverna common stock. Matthys does not oppose the request. Because these documents include SEC filings that are incorporated by reference into Matthys's amended complaint or are otherwise the proper subject of judicial notice, the Court grants defendants' request. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–1003 (9th Cir. 2018); Fed. R. Evid. 201. The Court takes judicial notice of the existence and content of the documents, but not the truth of any facts therein. *See Khoja*, 899 F.3d at 999–1000, 1003.

[3] These biomarkers are "(a) Urinary Protein-Creatinine Ratio ("UPCR"), which shows protein levels in the urine; (b) anti-dsDNA levels, the auto-antibodies associated with [lupus nephritis]; (c) levels of C3 complement proteins, which are consumed during an active immune response, and (d) levels of C4 complement proteins, which are also consumed during an active immune response." As the amended complaint explains, "the key indicators that [a lupus nephritis] treatment … is having a beneficial effect … are typically declines in UPCR levels and anti-dsDNA levels and increases in C3 and C4 levels. Conversely, increases in UPCR and anti-dsDNA levels and decreases in C3 and C4 levels … are key indicators of an increase in [lupus nephritis] activity, and are associated with … relapse."

cast KYV-101 as a potential breakthrough that might provide "the ability to reset the immune system with a single, well-tolerated treatment" and "improve the patient experience for those suffering from lupus nephritis, offering potential long-term benefits without the costs, inconveniences and toxicities associated with repeat treatments of existing therapies." At the same time, however, the offering documents noted that clinical testing is a "lengthy" and "inherently uncertain process." Kyverna therefore warned investors that "[t]he result of preclinical studies and early clinical trials of [its] product candidates may not be predictive of the results of later-stage clinical trials"; that "companies in the biopharmaceutical industry" commonly "suffer[] significant setbacks in advanced clinical trials … notwithstanding promising results in earlier trials"; and that "many companies that have believed their product candidates performed satisfactorily in clinical trials have nonetheless failed to obtain marketing approval of such product candidates" from the FDA or other regulatory authorities. As a result, "there c[ould] be no assurance that any of [Kyverna's] current or future clinical trials will ultimately be successful or support [FDA] approval of [its] current or any future product candidates." And as the offering documents made clear: "If [Kyverna] [we]re unable to develop, receive regulatory approval for, and ultimately successfully commercialize [its] product candidates, or experience[d] significant delays in doing so, [its] business w[ould] be materially harmed."

Kyverna's offering documents presented the clinical-trial data that was "available as of December 31, 2023," which, as noted above, was promising. But at some point in the months before Kyverna's IPO on February 8, 2024, the KYSA-1 trial generated additional data for Patients 1 and 2 that painted a less rosy picture. As Kyverna later disclosed at a conference in June 2024, Patient 1's "disease recurred, and she was placed back on immunosuppressants" "between months five and six" following her initial treatment with KYV-101 in July 2023—that is, sometime in December 2023 or January 2024. A Kyverna investor presentation published in June 2024 similarly indicated that by Day 165 following Patient 1's initial treatment (i.e., sometime between mid-December 2023 and mid-January 2024), her "clinical results had worsened" across all relevant biomarkers "to levels associated with [lupus nephritis]." The data Kyverna presented at the June 2024 conference also showed that Patient 2 had suffered a recurrence of one key

biomarker associated with lupus nephritis, proteinuria (or elevated levels of protein in the urine). While Kyverna's offering documents had reported most of Patient 2's biomarker data through day 95, the documents had reported data relating to proteinuria only through day 67. And the June 2024 disclosure revealed that Patient 2 had returned to markedly high urine-protein levels between days 67 and 95.

In its IPO, Kyverna offered shares of its common stock at a price of $22 per share. On the day before the June 2024 disclosure, the company's stock closed at a price of $14.44 per share. But on the day of the disclosure, Kyverna's stock fell to a closing price of $9.53 per share, followed by a further fall to $7.89 at the close of the next trading day.

Matthys purchased Kyverna stock on the secondary market in seven transactions between June 4, 2024 and July 17, 2024. In his amended complaint, he asserts claims under §§ 11, 12(a), and 15 of the Securities Act of 1933 against on behalf of a putative class "consisting of all persons and entities that purchased, or otherwise acquired, Kyverna common stock issued pursuant to or traceable to the [c]ompany's IPO." Matthys alleges that the offering documents "contained materially false and misleading statements" concerning Patient 1 and Patient 2's responses to KYV-101 and improvements to their biomarkers associated with lupus nephritis. The amended complaint also alleges that the omission of adverse data concerning Patients 1 and 2 from the offering documents violated defendants' disclosure obligations under two SEC regulations: Item 101, 17 C.F.R. § 229.303(b)(2)(ii), and Item 105, 17 C.F.R. § 229.105.

Now before the Court is defendants' motion to dismiss the amended complaint.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." If the complaint fails to do so, the defendant may move to dismiss under Federal Rule of Civil Procedure 12(b)(6). Dismissal is required if the plaintiff fails to allege facts allowing the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela*

*Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

In addition to satisfying Rule 12(b)(6), a plaintiff alleging violations of the Securities Act based on fraud must satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to plead fraud as to each allegedly fraudulent statement with "particularity." *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

## ANALYSIS

### I. Matthys fails to plausibly allege that defendants violated § 11.

Section 11 of the Securities Act "provides a private cause of action for investors who purchase securities pursuant to a registration statement containing 'an untrue statement of a material fact' or a registration statement that omits 'to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Hunt v. PricewaterhouseCoopers LLP (PwC)*, 159 F.4th 603, 611 (9th Cir. 2025) (quoting 15 U.S.C. § 77k(a)). Here, Matthys claims that the statements in the offering documents violated § 11 in three ways. First, he asserts that the offering documents "contained materially false and misleading statements" because they presented positive early clinical data for Patients 1 and 2 without including later, less favorable data collected for each patient. Second, Matthys contends that the later clinical data was "required to be stated" in the offering documents under Item 303,

which requires disclosure of "known trends or uncertainties that … [we]re reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Third, Matthys claims that the later clinical data was also "required to be stated" in the offering documents under Item 105, which compels disclosure of "the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.

Defendants conceded at the hearing on this matter that the omitted clinical data concerning Patient 1 and 2 was material. But they argue that Matthys's § 11 claim fails because it necessarily sounds in fraud, such that Matthys must (but fails to) satisfy a heightened pleading standard under Federal Rule of Civil Procedure 9(b). Defendants also insist that Matthys's amended complaint is improperly puzzle-pleaded and that § 11 does not impose liability for their accurate reporting of the early clinical data. Finally, defendants argue that Matthys fails to plead that the offering documents were required to include the omitted clinical data because the amended complaint does not plausibly allege that such data was available to defendants at the time of the IPO. Only the last of these arguments succeeds.

### A. Matthys's claim is not subject to a heightened pleading standard.

Defendants contend that Matthys's § 11 claim is subject to a heightened pleading standard under Rule 9(b). "Although the heightened pleading requirements of the PSLRA do not apply to section 11 claims, plaintiffs are required to allege their claims with increased particularity under Federal Rule of Civil Procedure 9(b) if their complaint 'sounds in fraud.'" *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (citations omitted). A complaint "sounds in fraud" if, for example, it "alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim." *Id.* (citation modified). "A typical example of that situation is where a plaintiff alleges that the same course of conduct constitutes both securities fraud under Section 10 as well as a violation of Section 11." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 545 (N.D. Cal. 2009). But as another court in this district has explained:

> Where, as here, the plaintiff has *not* alleged that the same course of conduct constitutes both a Section 11 violation and a violation of other laws necessarily sounding in fraud such as Rule 10b–5, the

> 'unified course of fraudulent conduct' test is essentially circular and is therefore uninstructive. Instead, courts examine the nature of the allegations themselves: "[f]raud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used). Under California law, the 'indispensable elements of a fraud claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages.'"

*Id.* at 545 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).

Though Matthys's amended complaint does not specifically allege fraud, defendants argue that the allegations in the complaint necessarily constitute fraud such that Rule 9(b) applies. The Court disagrees. While certain of Matthys's allegations might support a claim of fraud, the complaint "expressly eschews any allegation sounding in fraud" and states that the § 11 claim "is a non-fraud cause of action." So rather than necessarily sounding in fraud, the complaint on its face renders any fraud-based theory nonviable. In any case, even if defendants were correct that Matthys's § 11 claim were subject to and failed to satisfy Rule 9(b), "[t]he only consequence … would be that any allegations of fraud would be stripped from the claim. The allegations of innocent or negligent misrepresentation, which are at the heart of a § 11 claim, would survive." *Charles Schwab*, 257 F.R.D. at 545 (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)). That is already the result of Matthys's express disclaimer of "any allegation sounding in fraud." The Court therefore assesses only whether Matthys plausibly pleads a § 11 claim under a non-fraud theory.

**B. The amended complaint is not puzzle pleaded.**

Defendants next argue that Matthys's amended complaint should be dismissed because it is "puzzle pleaded," i.e., the complaint makes it "exceedingly difficult to discern precisely which statements are alleged to be misleading" because it "recites lengthy statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading." *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1274 (N.D. Cal. 2019) (citation modified). The Court disagrees. The amended complaint clearly explains that the challenged statements in the offering documents are those representing that (1) at the time of the

Kyverna's IPO, the company had only received positive clinical trial data, and (2) while it was highly possible that future data would show adverse results, such negative results were purely hypothetical. While the complaint at times includes lengthy block quotes from the offering documents, the complaint uses bold emphasis to identify with sufficient precision the actionable statements therein.

**C. The accuracy of the disclosed clinical data does not insulate defendants from liability for omitting later clinical data.**

Defendants also argue that they "cannot be liable for accurately reporting information" concerning the positive early results from the KYSA-1 trial. That is incorrect. Defendants may be liable under § 11 where, as Matthys alleges, their literally true statements are nevertheless misleading due to a material omission. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014).

**D. Matthys fails to plausibly allege that the adverse clinical data was known or reasonably available to defendants at the time of the IPO.**

As noted above, Matthys claims that the omission of adverse clinical data from the offering documents violated § 11 because it rendered statements concerning positive clinical data in the offering documents materially false or misleading and failed to disclose information required by Items 303 and 105. But for defendants to have a duty to disclose information under § 11, such information must have been known or reasonably available to defendants. *See In re Keegan Mgmt. Co., Sec. Litig.*, 794 F. Supp. 939, 946 (N.D. Cal. 1992) ("Section 11 … does not impose liability for the omission of material information which was unknown to, and not reasonably discoverable by, the defendants."); *see also Sodha v. Golubowski*, 154 F.4th 1019, 1035 (9th Cir. 2025) (holding that § 11 permits "claims against a registrant that *knew* about a material event before the IPO but chose not to disclose it" (emphasis added)); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (affirming conclusion that § 11 imposed no duty to disclose material information that was neither known to or expected by the defendant). Similarly, Items 303 and 105 require disclosure of information, and trigger liability under § 11 when information is omitted, only where such information is known to a defendant prior to an IPO. *See* 17 C.F.R.

§ 229.303(b)(2)(ii) (requiring disclosure only of "known trends or uncertainties"); *Lilien v. Olaplex Holdings, Inc.*, 765 F. Supp. 3d 993, 1019 (C.D. Cal. 2025) ("To state a claim under Item 105, an issuer must know, at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business." (quoting *Wandel v. Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022))); *see also Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 713 (3d Cir. 2020).

As defendants argue, the amended complaint fails to plausibly allege that, at the time of the IPO, defendants actually knew about or reasonably could have discovered the adverse clinical data omitted from the offering documents.

As to the adverse clinical data for Patient 1, Matthys's allegations of knowledge rely on disclosures in a conference statement and investor presentation by Kyverna in June 2024. The June 2024 disclosures suggest that the KYSA-1 trial first generated data showing a recurrence in Patient 1's lupus nephritis around 165 days following her treatment with KYV-101 in July 2023, i.e., by January 12, 2024. But the June 2024 disclosures offer no information on the subsequent transmission of that clinical data from the independent investigators conducting the KYSA-1 trial to Kyverna.

To fill that gap, Matthys relies on statements by three confidential witnesses, all of whom are former Kyverna employees.[4] Contrary to Matthys's arguments, however, none of the confidential-witness statements in the amended complaint support a plausible inference that defendants knew of or reasonably could have discovered Patient 1's adverse clinical data at the time of the IPO on February 8, 2024.

Two of the confidential witnesses quoted in the amended complaint indicated that they were unaware of the adverse clinical data concerning Patient 1 until after the IPO. Former

[4] Defendants argue that the Court should not consider these confidential-witness statements because they fail to satisfy the requirements for such statements under the PLSRA's heightened pleading standard. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3 981, 995 (9th Cir. 2009). But as already explained, that heightened pleading standard does not apply here because Matthys's § 11 claim does not sound in fraud. The Court therefore need not determine whether the confidential-witness statements on which Matthys relies satisfy the requirements for consideration under the PSLRA. *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) (explaining that these requirements apply where a plaintiff must plead scienter with particularity).



United States District Court
Northern District of California

Employee #1, "a former project manager in clinical operations for the KYSA-1 trial[,] … did not learn until after the fact that Patient 1 had relapsed, but recalled learning about it 'very close to the IPO.'" Former Employee #2, "a former medical science liaison who handled developing and executing strategies to support bringing Kyverna's treatments to the market," was similarly involved in the KYSA-1 trial. Former Employee #2 "noted that … information about the relapse was the kind of information that normally would be shared with [Former Employee #2] given [their] position in medical affairs at" Kyverna. But like Former Employee #1, they did not learn of Patient 1's adverse clinical data before the IPO and "only became aware of the relapse when Kyverna disclosed it publicly" in June 2024. That these employees involved in Kyverna's management of the KYSA-1 trial did not learn of Patient 1's relapse until after the IPO strongly suggests that the information was not known to anyone at Kyverna at the time of the IPO. It certainly does not support a plausible inference of Kyverna executives' pre-IPO knowledge of the adverse clinical data.

The amended complaint suggests that Former Employees #1 and #2 did not learn of this adverse clinical data earlier because "news of [Patient 1]'s relapse had been 'locked down' within Kyverna" and "Kyverna's management must have held onto this information 'pretty tightly.'" These allegations might support an inference that Kyverna executives learned of Patient 1's relapse prior to the IPO and deliberately hid that information from the company's employees and investors, knowing that it might harm the success of the IPO. But such intentional concealment of material information is precisely the type of fraud that Matthys insists he does *not* allege. *See Charles Schwab*, 257 F.R.D. at 545 (describing elements of fraud). In light of the amended complaint's express disclaimer of "any allegation sounding in fraud," the Court finds implausible any suggestion that Kyverna executives learned of the adverse clinical data before the IPO yet withheld such information from employees who would ordinarily receive it, like Former Employees #1 and 2.

The third confidential witness, "Former Employee #3," "was a Clinical Trial Manager at Kyverna" during the relevant period and "oversaw operations for the KYSA-1 trial." Despite his direct oversight of the trial, however, the amended complaint does not include any statement that

Former Employee #3 learned of Patient 1's relapse prior to the IPO. Again, that an employee intimately involved in Kyverna's management of the KYSA-1 trial apparently lacked knowledge of the adverse clinical data concerning Patient 1 strongly suggests that such information was not known or reasonably available to defendants.

Matthys nonetheless argues that Former Employee #3's statements plausibly establish defendants' knowledge of Patient 1's relapse at the time of the IPO because Former Employee #3 explained that the KYSA-1 trial coordinator usually entered clinical results in Kyverna's electronic system within eight days of a test. Thus, if the KYSA-1 trial generated adverse data for Patient 1 by mid-January 2024, as Kyverna's June 2024 statements suggest, that data would likely have been available in Kyverna's system at least one to two weeks before the February 8, 2024 IPO. Yet the complaint offers no allegations concerning the regularity with which Kyverna employees reviewed trial data once it became available in the company's system or the speed with which employees then conveyed such data to Kyverna executives. Absent such allegations, and given that multiple former employees who were involved in Kyverna's management of the KYSA-1 trial did not learn of Patient 1's relapse before the IPO, the amended complaint does not support a plausible inference that the adverse clinical data for Patient 1 was known or reasonably available to defendants at the time of the IPO.

Matthys's allegations concerning defendants' knowledge of the adverse clinical data for Patient 2 suffer from similar defects. As detailed above, the offering documents included data for Patient 2 concerning three of the four key biomarkers associated with lupus nephritis through day 95 following Patient 2's treatment with KYV-101. But the offering documents included data concerning the fourth biomarker, levels of protein in the urine, only through day 67. And as Kyverna disclosed in June 2024, Patient 2 exhibited significantly elevated levels of protein in the urine between days 67 and 95, indicating increased lupus nephritis activity. Matthys alleges that, because the offering documents reported data for Patient 2's other biomarkers through day 95, the adverse data on the level of protein in Patient 2's urine must also have been known to defendants before the IPO "[y]et … was omitted from the [o]ffering [d]ocuments."

Like Matthys's allegation concerning Patient 1's data, this allegation runs headlong into

the amended complaint's disclaimer of "any allegation sounding in fraud." The only reasonable inference from the allegations concerning the adverse test results for Patient 2 is that, if defendants learned of the results before the IPO, they intentionally concealed the results from investors in an act of fraud. Because the amended complaint "expressly eschews" such a fraud-based theory, it cannot form the basis of a plausible claim for relief. And the amended complaint provides no allegations plausibly suggesting that the omission of the adverse clinical data for Patient 2 was merely negligent or innocent.

In sum, the only plausible allegations in the amended complaint concerning defendants' knowledge of the adverse clinical data omitted from the offering documents rely on fraud-based theories that Matthys has repeatedly and expressly disclaimed. Matthys therefore fails to state a claim under § 11. Because this deficiency could be cured through the addition of more detailed allegations concerning defendants' negligent or innocent omission of known clinical data from the offering documents, the Court grants defendants' motion with leave to amend.

## II. Matthys fails to state a claim under § 12(a)(2) because he did not purchase securities directly from the IPO.

Matthys also asserts a claim against defendants under § 12(a)(2) of the Securities Act, which imposes liability on "[a]ny person who … offers or sells a security … by means of a prospectus …, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements … not misleading." 15 U.S.C. § 77l(a)(2). "Unlike Section 11, which permits an action by a plaintiff who has purchased a security that is merely 'traceable to' the challenged misstatement or omission, Section 12(a)(2) requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part of the initial offering, rather than in the secondary market." *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 966 (N.D. Cal. 2010) (citing *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir. 1999)). Defendants argue that Matthys fails to state a claim under § 12(a)(2) because he purchased his shares in Kyverna on the secondary market.[5]

---

[5] Defendants frame their argument as jurisdictional in nature. In their view, the fact that Matthys purchased securities only on the secondary market means he lacks constitutional standing to

United States District Court
Northern District of California

Matthys does not dispute that he purchased shares only on the secondary market. But he argues that a lead plaintiff need not individually satisfy the direct-purchase requirement to assert a § 12(a)(2) claim on behalf of a class. That may be true, but even the cases on which Matthys relies make clear that *some* named plaintiff (if not the lead plaintiff) must have purchased shares directly from the offeror. *See, e.g.*, *Fishbury, Ltd. v. Connetics Corp.*, 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006). Matthys has not joined any other named plaintiffs who could individually satisfy § 12(a)(2)'s direct-purchase requirement, so the § 12(a)(2) claim must be dismissed. *See In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d at 964 (citing *LaDuke v. Nelson*, 762 F.2d 1318, 1325 (9th Cir. 1985)). Because the defect is curable, however, the Court grants Matthys leave to amend. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1183 (C.D. Cal. 2008).

**III. Matthys' § 15 claim rises and falls with his other claims.**

Finally, Matthys asserts a claim under § 15 of the Securities Act. *See* 15 U.S.C. § 77*o*. "[S]ection 15 … require[s] underlying primary violations of the securities laws." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). "Because [Matthys] has failed to adequately plead a violation of the federal securities laws, it follows that [he] also has failed to adequately plead violations of … section 15." *Id.* Like Matthys's other claims, the § 15 claim is dismissed with leave to amend.

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is granted with leave to amend. Matthys must file any amended complaint within 28 days of the filing of this order. Failure to file

---

pursue a § 12(a)(2) claim. Some courts in this district appear to agree. *See, e.g.*, *In re Vocera Commc'ns, Inc. Sec. Litig.*, No. 13-cv-3567-EMC, 2015 WL 603208, at *2 (N.D. Cal. Feb. 11, 2015) (speaking of § 12(a)(2)'s direct-purchase requirement in terms of standing); *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, No. CV 11-2768-PSG, 2012 WL 12893520, at *5 (C.D. Cal. Feb. 16, 2012) (same). But defendants' argument relates only to the statutory requirements for relief under § 12(a)(2)—they do not address the elements of Article III standing, that is, whether Matthys has an injury-in-fact that is traceable to defendants' challenged statements that would likely be redressed by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The Court therefore understands the substance of defendants' argument to be that Matthys fails to state a claim. *Cf. id.* at 425–26 (distinguishing between statutory violations and injuries-in-fact sufficient to support constitutional standing).

an amended complaint will result in the dismissal with prejudice of all claims.

**IT IS SO ORDERED.**

Dated: March 23, 2026

P. Casey Pitts
United States District Judge