John T. Jasnoch (CA 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508
jjasnoch@scott-scott.com

*Co-Lead Counsel for Lead Plaintiff Clement Matthys*
*and the Proposed Class*

[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ANGELO RONDINI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> KYVERNA THERAPEUTICS, INC., J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, LEERINK PARTNERS LLC, WELLS FARGO SECURITIES, LLC, PETER MAAG, RYAN JONES, DOMINIC BORIE, JAMES CHUNG, KAREN WALKER, IAN CLARK, FRED E. COHEN, BRIAN KOTZIN, STEVE LIAPIS, BETH SEIDENBERG, and DANIEL K. SPIEGELMAN, <br><br> Defendants. | Case No. 5:24-cv-08869-PCP <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

**TABLE OF CONTENTS**

NATURE AND SUMMARY OF THE ACTION ........................................................................................1

JURISDICTION AND VENUE .................................................................................................................5

PARTIES ......................................................................................................................................................6

    A.    Plaintiff ........................................................................................................................6

    B.    Defendants ...................................................................................................................6

        1.    The Company....................................................................................................6

        2.    The Individual Defendants..............................................................................6

        3.    The Underwriter Defendants............................................................................8

SUBSTANTIVE ALLEGATIONS .........................................................................................................11

I.    FACTUAL BACKGROUND....................................................................................................11

    A.    Kyverna's Development and Testing of KYV-101 ...............................................11

    B.    The Key Metrics for Assessing the Effectiveness of KYV-101 ...........................12

    C.    The Offering Documents Report Highly Promising Initial Trial Results..............15

    D.    The Offering Documents Fail to Disclose that, as of the IPO, Patient 1's Test Results Had Materially Worsened and Patient 1 Experienced Disease Recurrence ................................................................................................................18

II.    THE TRUTH IS REVEALED...................................................................................................22

III.    THE MATERIALLY INACCURATE, MISLEADING, AND INCOMPLETE OFFERING DOCUMENTS ......................................................................................................25

IV.    THE WHO, WHAT, WHEN, WHERE, AND HOW OF THE OFFERING DOCUMENTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND RELATED OMISSIONS ......................................................................................................27

    A.    The Who, What, When, Where and How of the Materially False and Misleading Statements Alleged Regarding Patient 1's Clinical Data ..................27

    B.    The Who, What, When, Where and How of the Materially False and Misleading Statements Alleged Regarding Patient 2's Clinical Data ..................29

CLASS ACTION ALLEGATIONS .......................................................................................................30

CLAIM ONE ............................................................................................................................................31

CLAIM TWO............................................................................................................................................35

CLAIM THREE........................................................................................................................................36

PRAYER FOR RELIEF ..................................................................................................................36

DEMAND FOR TRIAL BY JURY ...............................................................................................37

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:24-CV-08869-PCP

Lead Plaintiff Clement Matthys ("Plaintiff") makes the following allegations, individually and on behalf of all others similarly situated, by and through Plaintiff's counsel, upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included, among other things, review and analysis of: (i) regulatory filings made by Kyverna Therapeutics, Inc. ("Kyverna" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations and conference call transcripts, and media reports issued and disseminated by the Company; (iii) interviews with former employees; and (iv) analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1. Plaintiff brings this federal class action under §§11, 12, and 15 of the Securities Act of 1933 ("Securities Act") against (i) Kyverna, (ii) certain of the Company's senior executives and directors who signed the Registration Statement, effective February 7, 2024, issued in connection with the Company's initial public offering ("IPO" or "Offering"), and (iii) the underwriters of the Offering (collectively, "Defendants"). Plaintiff alleges that the Registration Statement and Prospectus for the IPO (filed with the SEC on January 16, 2024, and February 8, 2024, respectively), including all amendments thereto (collectively, the "Offering Documents"), contained materially incorrect or misleading statements and/or omitted material information that was required by law to be disclosed. Defendant Kyverna, as the issuer of the securities at issue, is strictly liable for such misstatements and omissions therefrom. Each Defendant *other than* Kyverna itself is also strictly liable for such misstatements and omissions in their capacities as signers of the Registration Statement and/or as underwriters, statutory sellers, and/or offerors of the shares sold pursuant to the Offering (except that, unlike Defendant Kyverna, each of these other defendants has the ability to plead and to attempt to establish a statutory affirmative defense, commonly known as a "due diligence" defense).

2.      Kyverna, headquartered in Emeryville, California, is a clinical-stage biopharmaceutical company focused on researching, developing, manufacturing, and ultimately bringing to market a type of cell therapy treatment for patients suffering from autoimmune diseases.  The treatment involves a single infusion of genetically modified white blood cells called CD19 CAR T-cells, which are engineered to target and eliminate specific B-cells in the body that contribute to the abnormal immune activity seen in autoimmune diseases.

3.      At the time of the Offering, Kyverna did not have any commercial products on the market, and its lead product candidate was KYV-101, a specific type of CD19 CAR T-cell with a fully human CD19 binding domain.  The Company had received FDA approval to test KYV-101 on patients with lupus nephritis ("LN"), a kidney disease that commonly develops in patients with systemic lupus erythematosus ("SLE").  Kyverna touted KYV-101 as superior to current available LN treatments, which the Company described in the Offering Documents as "unsatisfactory in terms of achieving a complete renal response" and "preventing relapses," among other things.  Because of KYV-101's ability "to reset the immune system with a single, well-tolerated treatment," the Offering Documents represented that KYV-101 "offer[ed] potential long-term benefits without the costs, inconveniences and toxicities associated with repeat treatments of existing therapies."

4.      At the time of its IPO, Kyverna had only two small phase 1/2 clinical trials to test KYV-101 underway:  the KYSA-1 trial, based in the United States, and the KYSA-3 trial, based in Germany.  At the time of the Offering, both trials were still in their very early stages: Kyverna had just two enrolled and treated patients in the U.S.-based KYSA-1 trial, and just one enrolled and treated patient in the Germany-based KYSA-3 trial.  As sponsor of the trials, Kyverna monitored and received test result data on the trial participants from the relevant clinical trial sites on an ongoing basis.

5.      Kyverna conducted its IPO on or about February 8, 2024, offering 14.5 million shares of its common stock to the public at a price of $22 per share (the "Offering Price"), resulting in gross proceeds of roughly $319 million.  Kyverna granted the Underwriter Defendants (defined

herein) a 30-day option to purchase up to an additional 2.175 million shares of its common stock at the Offering Price, less underwriting discounts, and commissions.

6.     By the time of its IPO on February 8, the Company had clinical trial data for only three LN patients and reported the clinical results in its Offering Documents "available as of December 31, 2023" for these three patients.  In order to have a successful IPO, the clinical results reported by the Company needed to be sufficiently promising so as to be supportive (and not undermining) of investor belief that treatment with KYV-101 had strong potential to provide the "long-term benefits" touted in the Offering Documents.  The Offering Documents had only a few weeks of data for the patient enrolled in the KYSA-3 trial, so the treatment responses from the two KYSA-1 trial patients were critical.  For those two patients, the Offering Documents published charts with key biomarker measurements showing that both patients had improved after treatment with KYV-101.

7.     Unbeknownst to investors, however, the Offering Documents' positive representations about KYV-101 (and in particular its reporting of patient data from the ongoing KYSA trials) were materially inaccurate, misleading, and/or incomplete because they failed to disclose the then-existing, most current trial data available to Kyverna as of the date of the IPO—which was decidedly negative—regarding at least two of the three KYSA trial patients whose (stale) data had been included in the Offering Documents.  In addition, the Offering Documents failed to disclose that "Patient 1" (who had been dosed in July 2023) had suffered a relapse by the date of the IPO.

8.     After these undisclosed facts emerged after the Offering, the Company's shares fell sharply, severely harming investors.  As of the commencement of this Action on December 9, 2024, Kyverna's share price closed at $4.86 per share, a decline of more than 77% from the Offering Price of $22.

9.     By this Action, and based on Defendants' violations of the Securities Act as alleged herein, Plaintiff, on behalf of himself and other members of the Class (defined below), now seeks to recover damages for the losses suffered in connection with his and the Class's purchases of Kyverna shares pursuant or traceable to the defective Offering Documents.

10. The claims asserted herein are strict liability claims.

a. First, as the issuer, Kyverna is strictly liable for any material misstatements or omissions in the Offering Documents, regardless of whether they were made innocently, negligently, recklessly, or intentionally.

b. Second, as signatories of the Offering Documents, each of the Individual Defendants (defined below) is strictly liable for any material misstatements or omissions in the Offering Documents, except that each such Individual Defendant has the right to attempt to establish, as to himself or herself, an affirmative defense of "due diligence," which they bear the burden of pleading and proving. More specifically, under this statutory affirmative defense, each Individual Defendant may attempt to plead and prove that (as to himself or herself) they had, after reasonable investigation, reasonable grounds to believe that the allegedly materially misleading statements in the Offering Documents, at the time the Offering Documents became effective, were true, "and that there was no omission to state a material fact therein required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C §77k(b).

c. Third, as underwriters of the Offering, each of the Underwriter Defendants (defined below) is strictly liable for any material misstatements or omissions in the Offering Documents, except that each such Underwriter Defendant has the right to attempt to establish, as to itself, an affirmative defense of "due diligence," which it bears the burden of pleading and proving. More specifically, under this statutory affirmative defense, each Underwriter Defendant (like each Individual Defendant) may attempt to plead and prove that, as to itself, it had, after reasonable investigation, reasonable grounds to believe that the allegedly materially misleading statements in the Offering Documents, at the time the Offering Documents became effective, were true, "and that there was no omission to state a material fact therein required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C §77k(b).

d.     As the claims asserted herein are all grounded in strict liability predicated on the making of material misstatements and omissions as to each Defendant—and that such liability for Defendant Kyverna as issuer is effectively absolute (and that, as to each Individual and Underwriter Defendant, their liability is similarly absolute unless they are later able to plead and carry their burden of proving a possible affirmative due diligence defense)—it is irrelevant whether the material misstatements and omissions alleged herein were made innocently, negligently, recklessly, or intentionally for purposes of pleading Plaintiff's prima facie case as to liability, which requires that Plaintiff plead and prove only the elements of materiality and falsity (i.e., that the Offering Documents contained one or more statements that were materially false, or that omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading).

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77*l*(a)(2), and 77o, respectively.

12.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act, 15 U.S.C. §77v.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the acts and transactions giving rise to the violations of law complained of occurred, in part, in this District, including the dissemination of false and misleading statements within this District, certain Defendants reside and/or transact business in this District, and the Company maintains its corporate headquarters in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

5

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:24-CV-08869-PCP

**PARTIES**

**A.     Plaintiff**

15.     Plaintiff Clement Matthys is a resident of Marbella, Spain.  Plaintiff purchased shares of the Company's common stock that were issued pursuant or traceable to the Offering Documents as described in the Certification filed with this Court on February 7, 2025 (Dkt. No. 21-2), and was damaged thereby.

**B.     Defendants**

**1.     The Company**

16.     Defendant Kyverna is an Emeryville, California-based, clinical-stage biopharmaceutical company focused on developing cell therapies designed to treat patients suffering from autoimmune diseases.  Kyverna is incorporated under the laws of the state of Delaware and maintains its principal executive offices at 5980 Horton Street, STE 550, Emeryville, California 94608.  Kyverna's common stock is listed on the NASDAQ under the ticker symbol "KYTX."  According to the Offering Documents, as of December 31, 2023, Kyverna "had 84 employees, all of whom were full-time.  Of those, 67 were engaged in research and development activities," and all were located in the United States.

17.     Pursuant to the Securities Act, Kyverna, as the issuer of the securities sold pursuant and/or traceable to the Offering Documents, is strictly liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents.

**2.     The Individual Defendants**

18.     Defendant Peter Maag ("Maag") was, at all relevant times, Chief Executive Officer ("CEO") of, and a director of, the Company.  Defendant Maag reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

19.     Defendant Ryan Jones ("Jones") is, and was at all relevant times, Kyverna's Chief Financial Officer ("CFO").  Defendant Jones reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

20.    Defendant Dominic Borie ("Borie") is, and was at all relevant times, Kyverna's President of Research and Development. Defendant Borie reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

21.    Defendant James Chung ("Chung") is, and was at all relevant times, Kyverna's Chief Medical Officer ("CMO"). Defendant Chung reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

22.    Defendant Karen Walker ("Walker") is, and was at all relevant times, Kyverna's Chief Technology Officer ("CTO"). Defendant Walker reviewed, approved, and participated in making statements in the Offering Documents, which she signed.

23.    Defendant Ian Clark ("Clark") is, and was at all relevant times, a director of the Company and the chair of its board of directors. Defendant Clark reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

24.    Defendant Fred E. Cohen ("Cohen") is, and was at all relevant times, a director of the Company. Defendant Cohen reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

25.    Defendant Brian Kotzin ("Kotzin") is, and was at all relevant times, a director of the Company. Defendant Kotzin reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

26.    Defendant Steve Liapis ("Liapis") is, and was at all relevant times, a director of the Company. Defendant Liapis reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

27.    Defendant Beth Seidenberg ("Seidenberg") is, and was at all relevant times, a director of the Company. Defendant Seidenberg reviewed, approved, and participated in making statements in the Offering Documents, which she signed.

28.    Defendant Daniel K. Spiegelman ("Spiegelman") is, and was at all relevant times, a director of the Company. Defendant Spiegelman reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

29.     Defendants Maag, Jones, Borie, Chung, Walker, Clark, Cohen, Kotzin, Liapis, Seidenberg, and Spiegelman are collectively referred to herein as the "Individual Defendants."

30.     Pursuant to the Securities Act, as directors of the Company and/or as signers of the Offering Documents, each Individual Defendant is strictly liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents.  In addition, although not an element of Plaintiff's claims and an issue on which each Individual Defendant bears the burden of proof to the extent they seek to assert it as an affirmative defense, no Individual Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein, and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act.

### 3.     The Underwriter Defendants

31.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the IPO and assisted in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.  J.P. Morgan also participated in conducting and promoting the roadshow for the IPO.  J.P. Morgan's participation in and solicitation of offers in connection with the IPO was motivated by its financial interests, including its interest in collecting lucrative underwriting fees.  Defendant J.P. Morgan conducts business in this District.

32.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Morgan Stanley also participated in conducting and promoting the roadshow for the IPO.  Morgan Stanley's participation in and solicitation of offers in connection with the IPO was motivated by its financial interests, including its interest in collecting lucrative underwriting fees.  Defendant Morgan Stanley conducts business in this District.

33.     Defendant Leerink Partners LLC ("Leerink") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents.  Leerink also participated in conducting and promoting the roadshow for the IPO.  Leerink's participation in and solicitation of offers in

8

connection with the IPO was motivated by its financial interests, including its interest in collecting lucrative underwriting fees. Defendant Leerink conducts business in this District.

34. Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the Company's IPO and assisted in the preparation and dissemination of the Company's materially inaccurate, misleading, and incomplete Offering Documents. Wells Fargo also participated in conducting and promoting the roadshow for the IPO. Wells Fargo's participation in and solicitation of offers in connection with the IPO was motivated by its financial interests, including its interest in collecting lucrative underwriting fees. Defendant Wells Fargo conducts business in this District.

35. The Defendants listed in ¶¶31-34 are collectively referred to herein as the "Underwriter Defendants."

36. The Underwriter Defendants were instrumental in soliciting investors to purchase the Kyverna shares that were offered for sale in the IPO, and in selling such shares, to Plaintiff and other members of the Class. The table below lists each of the Underwriter Defendants, together with the number of allotted shares that each sold in the IPO:

| Name | Number of Shares |
| --- | --- |
| J.P. Morgan Securities LLC | 5,292,000 |
| Morgan Stanley & Co. LLC | 4,857,500 |
| Leerink Partners LLC | 2,900,000 |
| Wells Fargo Securities, LLC | 1,450,000 |

37. Pursuant to the Securities Act, as underwriters of the IPO, each Underwriter Defendant is strictly liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents. In addition, although not an element of Plaintiff's claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein, and accordingly no such Defendants will be able to establish a statutory "due diligence" affirmative defense under the Securities Act. Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

38.     Each Underwriter Defendant named herein is an investment banking firm whose activities include, *inter alia*, the underwriting of public offerings of securities.  As underwriters of the IPO, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted the disclosure of material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

39.     The Underwriter Defendants also assisted Kyverna and the Individual Defendants in planning the IPO.  They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.  During their "due diligence" investigation, the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

40.     In addition to having access to internal Kyverna corporate documents and records, the Underwriter Defendants and/or their agents, including their counsel, had access to Kyverna's management, directors, employees and attorneys to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Kyverna's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about Kyverna would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Kyverna's management, directors, employees, and lawyers, as of the date of the IPO, the Underwriter Defendants should have known of Kyverna's undisclosed then-existing problems, including disappointing and adverse results from its ongoing and unblinded clinical trials and the Offering Documents' materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

41.    The Underwriter Defendants also demanded and obtained an agreement from Kyverna, under which Kyverna agreed to indemnify and hold the Underwriter Defendants harmless from any liabilities under the Securities Act.

42.    The Underwriter Defendants, with the approval of the other Defendants, caused the Registration Statement to be filed with the SEC and declared effective so that they, and the Individual Defendants, could sell, and/or offer to sell, Kyverna shares to Plaintiff and other members of the Class pursuant to the Offering Documents.

## SUBSTANTIVE ALLEGATIONS

## I.    FACTUAL BACKGROUND

### A.    Kyverna's Development and Testing of KYV-101

43.    Kyverna does not have any FDA-approved commercial products on the market. Instead, as a clinical-stage biopharmaceutical company, its business is centered around the advancement of its lead product, KYV-101.  KYV-101 is a type of CD19 CAR T-cell therapy product initially developed by the National Institutes of Health ("NIH") for which Kyverna holds the license.  A CAR T-cell is a chimeric antigen receptor immune cell, and cell therapies involving genetically engineered CD19 CAR T-cells have been approved by the FDA for use in the treatment of certain types of cancer.

44.    The Offering Documents represented that Kyverna believed that CD19 CAR T-cell therapy, which targets and depletes a B-cell specific antigen, has potential as an effective treatment for autoimmune diseases.  As Kyverna explained in its Offering Documents, "Given the role of B cells in multiple autoimmune diseases, we believe it is reasonable to expect that depleting these cells using CD19 CAR T cells may result in therapeutic benefits in a broad range of B-cell driven autoimmune diseases."  They also described how Kyverna sought to research, develop, test, and ultimately commercialize KYV-101 to treat a variety of autoimmune diseases, beginning with lupus nephritis, a kidney disease that commonly develops in individuals suffering from an autoimmune condition called systemic lupus erythematosus.  As Kyverna's Offering Documents state:

> Current treatment strategies remain unsatisfactory in terms of achieving a complete renal response, preventing relapses, avoiding chronic kidney disease, and avoiding

11

progression to end-stage stage kidney disease.  Many patients fail to achieve complete remissions within six months of initiation of approved therapies, resulting in the use of sequential treatments or combination therapies to achieve diseases control.  Lupus nephritis can progress aggressively requiring prompt treatment to avoid permanent kidney damage which can arise following a single disease flare....

45.    In the Offering Documents, Kyverna touted the use of CD19 CAR T-cell therapy to treat LN as a potential breakthrough because it could reset the immune system with a single infusion of CAR T-cells; the Offering Documents further stated that Kyverna believed that "the ability to reset the immune system with a single, well-tolerated treatment could provide the opportunity to improve the patient experience . . . offering potential long-term benefits without the costs, inconveniences and toxicities associated with repeat treatments of existing therapies."  The Offering Documents further stated that KYV-101 is differentiated from other CD19 CAR-T cell therapies on the market by its use of a fully human CD19 binding domain, which "has the potential to reduce the likelihood of the development of anti-CAR antibodies, preserving the possibility of retreatment."

46.    At the time of its IPO on February 8, 2024, Kyverna had two small phase 1/2 clinical trials underway to study KYV-101 as a treatment for refractory LN in patients suffering from active LN who do not get better with standard therapies.  These two studies were known as the KYSA-1 (NCT05938725) and KYSA-3 (NCT06342960) trials.[1]

**B.    The Key Metrics for Assessing the Effectiveness of KYV-101**

47.    LN disease activity is assessed from urine and blood tests that measure certain biomarkers associated with LN that are indicative of renal inflammation and immune activation. The tests commonly measure patients' (a) Urinary Protein-Creatinine Ratio ("UPCR"), which shows protein levels in the urine; (b) anti-dsDNA levels, the auto-antibodies associated with LN; (c) levels of C3 complement proteins, which are consumed during an active immune response; and (d) levels of C4 complement proteins, which are also consumed during an active immune response.

---

[1]    Kyverna also intended to pursue clinical trials of KYV-101 in patients with multiple sclerosis, myasthenia gravias, and systemic sclerosis, but had only recently received FDA clearance to begin clinical testing for those conditions and had not yet enrolled any patients in those studies as of the IPO.

12

48.    Assessing UPCR is an important test for LN because it is a way to test for proteinuria, or elevated levels of protein in the urine, which is a hallmark of LN.  As the Offering Documents stated:

> [P]roteinuria, [i.e.,] elevated levels of protein released in urine, serves as a biological marker of LN disease activity and potential renal damage, and provides a more objective clinical endpoint through which we can measure the potential clinical benefits of KYV-101. . . . *Resolution of proteinuria, measured through UPCR, is therefore used as a key component in the quantitative and objective composite endpoint, CRR [Complete Renal Response],* which we use as an endpoint for KYSA-1 and KYSA-3.  CRR has been accepted as a registration-enabling endpoint for LN clinical trials.  (emphasis added).

A UPCR test is conducted using a spot urine sample collected during urinalysis.  A UPCR of 0.5 or higher is the generally accepted threshold for a diagnosis of LN, and higher UPCR scores are associated with higher LN disease activity.

49.    Anti-dsDNA antibody levels also reflect LN disease activity.  Anti-dsDNA is a lupus-specific antibody that is a marker of disease activity and is rarely present in healthy individuals.  Anti-dsDNA levels, which are measured from a blood sample, are reported in IU/mL (international units per milliliter), and higher levels correlate with greater LN disease activity.  In general, anti-dsDNA levels of 0-25 IU/mL are considered negative or non-reactive for lupus and high levels such as those above 200 IU/mL are strongly indicative of active disease activity.

50.    "C3" and "C4" complement proteins play a key role in the body's immune system that helps protect against infections and other diseases.  They are part of the complement system, a cascade of proteins that work together to enhance the effectiveness of antibodies and other immune defenses.  C3 and C4 complement proteins are consumed by the body during immune system activation when LN is active.  Accordingly, *low* C3 and C4 complement levels, which are measured through a blood test, are associated with LN disease activity.  Normal C3 levels in healthy individuals are at least 80 mg/dL (milligrams per deciliter), and normal C4 levels in healthy individuals are at least 15 mg/dL. Values below these thresholds are associated with an LN disease flare, with greater reductions linked to higher LN disease activity.  C3 and C4 are often measured together in blood tests to help diagnose and monitor conditions like autoimmune diseases and infections.

13

51.    The above-referenced biomarkers (UPCR, anti-dsDNA, and C3 and C4 complement levels) are evaluated in patients that undergo treatment for LN to determine the efficacy of treatment and to monitor for relapse.  In clinical trials for LN, a successful therapeutic outcome is typically defined by achieving a Complete Renal Response ("CRR"), which is commonly characterized by a UPCR of 0.5 or lower, stable, or improved renal function, and no use of immunosuppressive therapy at a specified point in time following treatment.  As Kyverna noted in its Offering Documents, "CRR has been accepted as a registration-enabling endpoint for LN clinical trials" and was used by Kyverna "as an endpoint for KYSA-1 and KYSA-3." According to the clinical trial registration record for the KYSA-1 trial, the timeframe for assessing CRR in a patient was up to 52 weeks.

52.    In sum, the key indicators that an LN treatment result is having a beneficial effect (such as moving towards or achieving CRR) are typically *declines* in UPCR levels and anti-dsDNA levels and *increases* in C3 and C4 levels.  Conversely, *increases* in UPCR and anti-dsDNA levels and *decreases* in C3 and C4 levels (below 80mg/dL and 15mg/dL, respectively) are key indicators of an increase in LN activity, and are associated with LN relapse.

53.    As noted above, as of the IPO Kyverna had initiated two clinical trials to study KYV-101 in patients with LN.  The KYSA-1 trial (NCT05938725) was a Phase 1/2 open-label[2] multicenter trial that was being conducted in locations across the United States to study, among other things: the incidence of adverse events, laboratory abnormalities, and frequency of dose-limiting toxicities; and to evaluate efficacy, immunogenicity (the ability of a substance to cause an immune response in an organism), and disease-related biomarkers.   The KYSA-3 trial (NCT06342960) was a similar Phase 1/2 open-label multicenter trial that was being conducted in Germany to study the same measures.  At the time of the IPO, both studies had already begun (and were also accepting new patients for enrollment).  As the sponsor of the trials, and as further detailed below, Kyverna monitors and receives test result data on the trial participants from the relevant clinical trial sites on an ongoing basis.

---

[2]    "Open-label" means that study participants and researchers know what treatment they are receiving.

**C.      The Offering Documents Report Highly Promising Initial Trial Results**

54.      In the Offering Documents, Kyverna reported certain early results from its clinical trials that were "available as of December 31, 2023."  In particular, the Offering Documents reported the data for three LN patients that had been treated with KYV-101 as of that date: two in the U.S.-based KYSA-1 trial, and one in the Germany-based KYSA-3 trial.

55.      The Offering Documents reported that the first clinical trial patient, who was enrolled in the KYSA-1 trial, had been dosed in July 2023.

56.      At issue in this case are the results reported in the Offering Documents for the KYSA-1 trial.  According to the Offering Documents, "[t]he primary endpoints for the KYSA-1 trial are the incidence of adverse events and laboratory abnormalities and the frequency of dose-limiting toxicities," and "[s]econdary endpoints of KYSA-1 include characterizing pharmacokinetics and pharmacodynamics, evaluating disease-related biomarkers, evaluating efficacy including Complete Renal Response, or CRR, and time to CRR, and evaluating immunogenicity."[3]

57.      The Offering Documents' discussion of its early clinical trial results included charts that showed each patient's UPCR, anti-dsDNA levels, and C3 and C4 levels over time, as measured at regular intervals following treatment with KYV-101.  The two patients in the KYSA-1 trial were identified in the charts as "KYSA-1 Pt #1" and "KYSA-1 Pt #2."[4]  Those charts are reproduced below:

---

[3]      Primary and secondary endpoints are defined by a study's sponsor before a study begins. Primary endpoints are the principal outcomes of a study used to evaluate the effectiveness of a treatment, and secondary endpoints measure additional outcomes.  One of the primary endpoints of the KYSA-1 trial included looking at the incidence of adverse events—unfavorable changes to a participant's condition.  The secondary endpoints of the KYSA-1 trial included looking at KYV-101's effectiveness at treating LN by examining LN-related biomarkers and were therefore important in evaluating whether KYV-101 performed better than existing LN treatments.

[4]      With respect to "KYSA-1 Pt #3" and "KYSA-3 Pt #2" referenced in the charts, the Offering Documents stated that these patients were "enrolled and apheresed but not yet dosed as of 12/31/2023."

15









58.      The Offering Documents also represented that there was "observed improvement in UPCR"—i.e., *decreases* in UPCR—for all three of these clinical trial patients who had been treated with KYV-101.  This information is reflected in the charts above for each patient, which shows not only beneficial *decreases* in UPCR, but also beneficial decreases in anti-dsDNA levels following treatment (the treatment date being reflected by the vertical dotted line on each chart

labeled "CAR T Infusion" associated with "Day 0" on the x-axis).[5]  The charts also showed that C3 and C4 complement levels for both patients in the KYSA-1 trial following treatment had increased to levels no longer associated with LN disease activity.

59.     With respect to Patient 1, whose results are reflected in the black lines above, the Offering Documents also stated that "[a]fter KYV-101 treatment therapy, patient 1 discontinued immunosuppressive therapy except 10 mg [milligrams] prednisone, which was discontinued on day 31."  The Offering Documents (consistent with data in the above charts) also stated that Patient 1's "UPCR improved from 1.5 at baseline to 0.5 by day 56 and improved to below 0.5 by day 120 without glucocorticoids or immunosuppressive therapy."

60.     The Offering Documents further reported Patient 1's C3 and C4 complement levels at various intervals up to 140 days following Patient 1's treatment with KYV-101.  As shown in the charts above, Patient 1's C3 and C4 levels on Day 0 were reported at 55 mg/dL and 14 mg/dL. The Offering Documents reported that by Day 140, Patient 1's C3 level and C4 levels were 85 mg/dL and 25 mg/dL,[6] respectively, and importantly, had improved (increased) to above the levels associated with LN disease activity (a positive result).

61.     The Offering Documents reported Patient 1's anti-dsDNA levels at various internals up to *120 days* following treatment.  As shown in the charts above, Patient 1's anti-dsDNA level, which was reported at 300 IU[7] on Day 0, had dropped to 115 IU by Day 120 and appeared to be following a steep downward trajectory, suggesting that anti-dsDNA levels would continue to decrease (i.e., continue to improve) as additional data was made available.  However, no Day 140 data for Patient 1's anti-dsDNA levels was reported in the Offering Documents.

---

[5]     With respect to the term "Day [X]," the X refers to number of "Days Post-Infusion" as reflected by the X-axis of the Offering Documents' charts; i.e., it refers to the number of days after the patient's treatment with KYV-101.

[6]     Because the Offering Documents reported patient results using the charts reproduced above but did not include an underlying table of data for each patient, when discussing data taken from these charts Plaintiff has given his best approximation of the relevant "numbers" based on a close reading of the charts.  Actual numbers may therefore have varied slightly from what Plaintiff has stated based on interpreting the charts.

[7]     Although the Y-axis on the chart printed in the Offering Documents is labeled "anti-dsDNA IU," anti-dsDNA levels are normally reported as the concentration of IU/mL, or the number of international units per milliliter.  For the sake of accuracy and consistency, this Second Amended Complaint will use the same standard of measurement shown in the charts.

62.     LN-related biomarker measurements for the second patient in the KYSA-1 trial ("Patient 2") are depicted in green in the charts above.  With respect to Patient 2, the Offering Documents reported that "UPCR improved from 3.4 at baseline to 0.6 by around day 30."  The Offering Documents also showed anti-dsDNA and C3 and C4 complement levels at various intervals for approximately 95 days following Patient 2's treatment with KYV-101, and showed a desirable decrease in anti-dsDNA levels and desirable increases in C3 and C4 complement levels.  The Offering Documents reported Patient 2's UPCR at various intervals through about 67 days after treatment and showed that Patient 2's UPCR had decreased to just above 0.5 (another positive result) by that date.  Patient 2's UPCR was the only measurement not reported for that patient through at least roughly 95 days.

63.     In sum, for the two patients in the KYSA-1 trial whose results were reported in the Offering Documents, the charts published in the Offering Documents showed UPCR values having declined to at or near 0.5 (an improvement), a beneficial trend of decreasing anti-dsDNA levels, and positive improvements to C3 and C4 values to levels above the threshold for LN disease activity.  Nor was there any reported data that provided a basis to conclude that any of the three patients for whom data was reported (including the one patient in the KYSA-3 trial) had experienced, or was headed towards, relapse or disease recurrence.[8]

**D.     The Offering Documents Fail to Disclose that, as of the IPO, Patient 1's Test Results Had Materially Worsened and Patient 1 Experienced Disease Recurrence**

64.     As of the IPO, a combined total of only three patients had received KYV-101 treatment in Kyverna's two clinical trials.  For Kyverna to have had a successful IPO (or at least to be able to launch at a price of anything close to the $22 per share Offering Price), the early clinical results reported by the Company from the KYSA trials needed to be sufficiently promising so as to be supportive (and not undermining) of the belief that treatment with KYV-101 had strong potential to provide the "long-term benefits without the costs, inconveniences and toxicities

---

[8]     The biomarker measurements for the third patient for whom any data was reported, namely the patient enrolled in the KYSA-3 study, are shown in blue in the above charts.  UPCR, anti-dsDNA, and C3 and C4 complement levels for that patient were reported through only about 30 days after treatment and, although the results were preliminary, they were generally positive.

18

associated with repeat treatments of existing therapies" that was touted in the Offering Documents. Indeed, given the extremely small sample size, any indication in the clinical results suggesting that the effectiveness of the KYV-101 treatment was materially less on LN disease activity than what was reflected in the Offering Documents—even for a single patient—would (a) materially increase investor concerns about the efficacy of KYV-101, leading the market to materially lower its assessment of the probability that KYV-101 would ultimately generate sufficiently positive clinical trial results to obtain FDA approval, which in turn would (b) lead investors to value Kyverna shares for significantly less than their $22 Offering Price, and would have called into question the IPO itself.

65. Unbeknownst to investors and the members of the Class, however, as of the IPO, the test results for Patient 1 in the KYSA-1 trial had actually shown significantly ***increased*** LN activity after initial improvement, and Patient 1 had experienced a relapse of LN.

66. Specifically, as the Company would later disclose at an industry symposium on June 14, 2024 at the annual European Congress of Rheumatology ("EULAR Conference"), Patient 1 had experienced relapse (i.e., recurrence of their LN) between five and six months (roughly 150 to 180 days) after being dosed with KYV-101. As the Company stated at this conference, Patient 1 "*had initially a very good response, with the ability to discontinue the immunosuppressant*," but "*unfortunately, by between months five and six, her disease recurred, and she was placed back on immunosuppressants*." (emphasis added).

67. Because the Offering Documents stated that Patient 1 had been treated (dosed) in July 2023, the Company's statement that Patient 1 had experienced disease recurrence and been placed back on immunosuppressants "between months five and six" effectively conceded that the patient had relapsed (and been put back on another treatment regimen) *between early December 2023 and late January 2024—i.e.*, *at least a week* <u>before</u> *(if not as much as two months before) the February 7, 2024 effective date of the Offering Documents.*[9]

---

[9]    Depending on whether Patient 1 received their KYV-101 dose in early or late July 2023, "five or six months" from dosing for Patient 1 could have been as early as December 1, 2023 (five months after July 1, 2023), but would in any event have been no later than January 31, 2024 (six months after July 31, 2023, and still a full week <u>before</u> the effective date of the IPO).

19

68.    Two former Kyverna employees confirmed that KYSA-1's Patient 1 had relapsed after treatment.  First, Former Employee #1 ("FE #1")—a former project manager in clinical operations for the KYSA-1 trial during the summer of 2023 through mid-2024—confirmed that the relapse occurred in a patient enrolled in the KYSA-1 trial, and that it was the same patient that Kyverna referred to as that trial's "Patient #1" in prior presentations.  FE #1 also confirmed that this patient was treated with KYV-101 in July 2023—i.e., at least *six* months before the February 7, 2024 IPO.  Tellingly, FE #1 also noted that news of the patient's relapse had been "locked down" within Kyverna, with the information having been "held between four or five people" at the Company who were all executives.  According to FE #1, those executives would have included CEO Peter Maag and Kyverna's Global Medical Director Frances Kim.  Accordingly, FE #1 did not learn until after the fact that Patient 1 had relapsed, but recalled learning about it "very close to the IPO."

69.    In addition, Former Employee #2 ("FE #2")—a former medical science liaison who handled developing and executing strategies to support bringing Kyverna's treatments to the market and who joined Kyverna during the first half of 2024—also confirmed that the patient that Kyverna regularly referred to as "Patient #1" in its presentations was the same patient who had been part of the KYSA-1 study who had relapsed.  FE #2 only became aware of the relapse when Kyverna disclosed it publicly at the EULAR Conference, which FE #2 attended.  After viewing Kyverna's presentation, FE #2 spoke with someone in Clinical Operations at Kyverna at the conference with first-hand knowledge of the relevant facts who advised FE #2 that the relapse had occurred before FE #2 joined the Company.  FE #2 also noted that Kyverna's management must have held onto this information "pretty tightly," as information about the relapse was the kind of information that normally would be shared with FE #2 given FE #2's position in medical affairs at the Company.

70.    Significantly, Kyverna's investor presentation, which the Company also published on June 14, 2024, also disclosed additional information about Patient 1's anti-dsDNA levels and C3 and C4 complement levels.  That information clearly showed that, by approximately Day 165— *i.e.*, *by sometime between mid-December 2023 and mid-January 2024* (depending on whether

20

Patient 1 received her treatment relatively early or relatively late in July 2023)—Patient 1's clinical results had worsened to levels associated with LN and increased LN disease activity. Specifically, by Day 165—*i.e., by the date of the Offering*:[10]

    a.    Patient 1's anti-dsDNA levels were no longer trending downward, as shown in the Offering Documents, but had increased to over 250 IU/mL from the last-reported measurement of 115 IU/mL at Day 120, consistent with high LN disease activity.

    b.    Patient 1's C3 complement levels had decreased to 45 mg/dL from the last-reported measurement of 85 mg/dL at Day 140 and had fallen to a level associated with higher LN disease activity.

    c.    Patient 1's C4 complement levels had decreased to 10 mg/dL from the last-reported measurement of 25 mg/dL at Day 140 and had also fallen to a level associated with higher LN disease activity.

71. These results from Patient 1 most certainly would have been available to Kyverna before the IPO, as information provided by another former Kyverna employee confirms.

72. Former Employee #3 ("FE #3") was a Clinical Trial Manager at Kyverna from August 2023 to June 2024 who oversaw operations for the KYSA-1 trial. One of FE #3's duties was to ensure that data collected from clinical trial patients by the study sites would be transmitted to Kyverna in a prompt and timely manner. According to FE #3, patient blood and urine samples that were tested for relevant biomarker results would be taken at the clinical trial study sites and would then be processed by a local lab, which would typically have the lab results available within 24 hours of having received the patient samples from the site. Available test results were recorded in the patient's electronic medical record ("EMR") and could be accessed by the clinical trial study site coordinator. The site coordinator would then enter the test results from the EMR into Kyverna's Electronic Data Capture System ("EDC System"), where it would be available to Kyverna personnel to immediately review electronically from the same EDC System. Although it could take roughly a week for a site coordinator to enter the relevant patient test data into the EDC

---

[10]    165 days from July 31, 2023—the last date in July 2023 on which Patient 1 could have been dosed—was January 12, 2024, nearly four weeks *before* the IPO.

System, FE #3 stated that it was not uncommon for Kyverna to call the study site coordinator to ask for information to be entered more quickly if Kyverna needed it.  Accordingly, patient test results were effectively available to Kyverna immediately after they were recorded in the EMR, even in those circumstances where Kyverna might have to call or otherwise contact the sites to make sure that the information posted on the EDC System was the most current available.

## II.   THE TRUTH IS REVEALED

73.   On June 14, 2024, at the annual EULAR Conference which was held in Vienna, Kyverna hosted a symposium providing an update on KYV-101, at which Kyverna belatedly disclosed that its first clinical trial patient—Patient 1—had relapsed, and presented certain additional clinical data from its ongoing KYSA-1 trial which presented a decidedly less positive picture than what had been included in the Offering Documents.  Kyverna filed a copy of that investor presentation on a Form 8-K with the SEC later that same day.

74.   During the prepared remarks portion of the symposium, Kyverna's Chief Medical Officer James Chung gave an update on the LN patients treated with KYV-101, noting that Kyverna now had five patients enrolled in its KYSA clinical trials.

75.   Chung then disclosed:

> You can see that in patient one, who received half of the target dose and received 50 million cells, had initially a very good response, with the ability to discontinue the immunosuppressants.  She was on 10 mg of prednisone and discontinued that on day 31.  *But unfortunately, between months five and six, [Patient 1's] disease recurred, and she was placed back on immunosuppressants.*  (emphasis added).

76.   Because Patient 1 was dosed in July 2023, Patient 1's relapse occurred sometime between December 2023 and January 2024, prior to the IPO.  *See supra* ¶67 & n.10.

77.   The investor presentation also included a slide discussing Patient 1's results, which contained three charts showing Patient 1's anti-dsDNA levels and C3 and C4 complement levels up to 265 days after treatment.  Those charts are reproduced below (the charts also show data for other patients; the data for Patient 1 is shown in dark green).  In these charts, Kyverna disclosed for the first time adverse information concerning Patient 1's worsening condition between (a) the last day for which data was actually contained in the Offering Documents, and (b) the last

datapoints that had actually been *available* as of the IPO, as shown in the highlighted portions of the charts below.





78.    This data shows that Patient 1's anti-dsDNA levels from "Day 120"—the last day for which this data was reported in the Offering Documents—had experienced a disturbing *increase* by the date of Kyverna's IPO, and that Patient 1's C3 and C4 complement levels from "Day 140" (again, the last day for which this data was reported in the Offering Documents) had both experienced disturbing *decreases* by the date of Kyverna's IPO.

79.    In other words, even if Patient 1 had been dosed on the last day of July 2023, by "Day 165" (which would equate to January 12, 2024 at the latest), these charts show that (a) Patient

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:24-CV-08869-PCP

1's anti-dsDNA levels had reversed their prior decline and, by the date of the IPO, had increased to over 250 IU/mL, *or more than twice the most recent level reported in the Offering Documents*; (b) Patient 1's C3 complement levels had actually decreased to 45 mg/dL by the date of the IPO, constituting a deterioration back to a level that was not only associated with significant LN disease activity, but that also represented a decline to a level that was actually worse than (i.e., below) Patient 1's C3 level prior to treatment; and (c) Patient 1's C4 complement levels had decreased to 10 mg/dL by the date of the IPO, which also constituted a deterioration back to a level that both reflected significant LN disease activity *and* a decline to a level that was again worse than it had been before Patient 1 had received her KYV-101 treatment.[11]

80.    For the first time, at the EULAR Conference, Kyverna also disclosed that Patient 2's UPCR had *increased* from 0.5 on Day 67—the last date for which this data for Patient 2 had been included in the Offering Documents—to just above 2.5 approximately 95 days after treatment.  Patient 2's data is highlighted in the more thickly shaded line in the chart below (which was taken from Kyverna's investor presentation):



_____

[11]    As noted above in ¶60, Patient 1's C3 and C4 levels on Day 0 were reported at 55 mg/dL and 14 mg/dL, respectively.

24

81.    However, because the charts reproduced at ¶57 above, which were the ones provided in the Offering Documents, contained other data as of "Day 95" for Patient 2, the Offering Documents confirm that "Day 95" data was available as of no later than December 31, 2023—i.e., well before the IPO.  Yet the data showing this sharp and disconcerting leap in Patient 2's UPCR levels (as shown within the yellow highlighted portion of the chart) was omitted from the Offering Documents.

82.    Following Kyverna's presentation at the EULAR Conference, the Company's stock, which closed at $14.44 the previous day, fell 34% to close at $9.53 on June 14, 2024.  Then, on the next trading day, Monday, June 17, 2024, Kyverna's stock fell another $1.64, or 17%, to close at $7.89.  Analysts blamed the selloff on the data that Kyverna presented at the EULAR Conference.  For example, JP Morgan stated that news of the relapse of Patient 1 "was a surprise to many," noting in a June 14, 2024 Analyst Report that the "weakness in KYTX shares" was "centered around disease recurrence in one lupus patient."

83.    On the date this case was filed (December 9, 2024), the Company's stock closed at $4.86 per share, or more than 77% below the $22 Offering Price.

## III.    THE MATERIALLY INACCURATE, MISLEADING, AND INCOMPLETE OFFERING DOCUMENTS

84.    On October 5, 2023, Kyverna filed a DRS Draft Registration Statement on Form S-1 with the SEC which, following amendments, would be used for the IPO in response to SEC comments.  On February 6, 2024, Kyverna filed an amendment to the Registration Statement which registered 14.5 million Kyverna shares for public sale, including 2.175 million shares that the Underwriter Defendants had the option to purchase, solely to cover over-allotments.  The SEC declared the Registration Statement effective on February 7, 2024.  On February 8, 2024, Defendants priced the IPO at $22 per share and filed the final Form 424B4 Prospectus for the IPO, which forms part of the Registration Statement.

85.    The Offering Documents contained materially false and misleading statements, omitted material facts necessary to make the statements contained therein not misleading, and

failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

86.    First, the Offering Documents contained materially false and misleading statements concerning Patient 1's response to KYV-101. Specifically, the Offering Documents represented that there was "observed improvement in UPCR" in Patient 1 and stated that "[a]fter KYV-101 treatment therapy, [P]atient 1 discontinued immunosuppressive therapy except 10 mg [milligrams] prednisone, which was discontinued on day 31." The Offering Documents also included clinical data for Patient 1 (as presented in the charts reproduced at ¶57 above) that showed improvement in Patient 1's anti-dsDNA and C3 and C4 complement levels after being treated with KYV-101. More specifically, these statements (including the charts) showed that, by Day 120, Patient 1's anti-dsDNA levels had decreased significantly, from 300 IU/mL to 115 IU/mL; and that by Day 140, Patient 1's C3 levels had increased from 55 mg/dL (at Day 0) to 85 mg/dL and C4 levels had increased from 14 mg/dL (at Day 0) to 25 mg/dL. The last C3 and C4 levels the Offering Documents reported for Patient 1—at Day 140—were both above the threshold associated with LN disease activity.

87.    The statements identified immediately above in ¶86, including the information presented in the charts provided in the Offering Documents concerning Patient 1's data reproduced at ¶57 above, were materially false and misleading because they presented key biomarker results showing that Patient 1 had improved after treatment with KYV-101 but failed to disclose the most current adverse data about Patient 1 that was then-existing and available to Defendants as of the date of the IPO (i.e., their data as of Patient 1 Day 165, which was not later than January 12, 2024, *see supra* ¶¶67, 79), which showed that Patient 1's condition had worsened. In other words, by not later than January 12, 2024—nearly four weeks before Kyverna's IPO—Patient 1's anti-dsDNA levels had *increased* considerably to over 250 IU/mL, and C3 and C4 complement levels had *decreased* considerably to 45 mg/dL and 10 mg/dL, respectively, to values consistent with high LN disease activity. In fact, Patient 1's C3 and C4 levels had fallen *below* Patient 1's initial reported C3 and C4 levels prior to any treatment. Relatedly, these statements were also rendered

26

materially misleading because they omitted to disclose that Patient 1 had relapsed sometime between December 2023 and January 2024 prior to the Offering.

88.     Second, the Offering Documents presented materially false and misleading clinical data for Patient 2 (as depicted in the charts referenced at ¶57 above) because they reported positive data showing Patient 2's anti-dsDNA and C3 and C4 complement levels to Day 95, but *failed* to disclose then-existing, adverse data that was available to Defendants as of the IPO showing that Patient 2's UPCR had worsened by Day 95.[12]  The Offering Documents reported Patient 2's UPCR only to Day 67, showing that it had fallen to 0.5, which represented a significant improvement. However, by Day 95, Patient 2's UPCR had increased nearly five-fold to 2.5, indicating that proteinuria, a hallmark of LN, had returned.  The adverse data showing Patient 2's UPCR after Day 67 was not included in the Offering Documents.

**IV.     THE WHO, WHAT, WHEN, WHERE, AND HOW OF THE OFFERING DOCUMENTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND RELATED OMISSIONS**

**A.     The Who, What, When, Where and How of the Materially False and Misleading Statements Alleged Regarding Patient 1's Clinical Data**

89.     With respect to the materially false and misleading statements (and related omissions) identified in ¶¶86-87 above concerning Patient 1, Plaintiff further alleges as follows:

a.     As to "who" made these allegedly false and misleading statements concerning Patient 1, Plaintiff states that they were made by Defendant Kyverna, as well as by each Individual Defendant who affixed their signature to the Offering Documents. Plaintiff further alleges that each Underwriter is deemed responsible for and liable for all such statements (and related omissions) pursuant to the express statutory text of §11 of the Securities Act.

b.     As to the "what" of these allegedly false and misleading statements concerning Patient 1, such statements are specifically identified in ¶¶86-87 above, including with reference to the information presented in the charts provided in the Offering Documents concerning Patient 1's data reproduced at ¶57 above.

---

[12]     For Patient 2, Day 95 was no later than December 31, 2023, well before the February 2024 Offering.  *See supra* ¶81.

c. As to the "when" of these allegedly false and misleading statements concerning Patient 1, Plaintiff states that they were made effective as of 4:00 p.m. on February 7, 2024, which was the time and date when the SEC declared the Offering Documents to have become "effective."

d. As to the "where" of these allegedly false and misleading statements concerning Patient 1, such statements were made in the Offering Documents, which were publicly available on, *inter alia*, both the SEC's and Kyverna's respective websites at all relevant times from no later than the moment that they were declared "effective" at 4:00 p.m. on February 7, 2024.

e. As to the "how" of these allegedly false and misleading statements concerning Patient 1, Plaintiff states that the reasons why and how these statements were materially false and misleading are set forth in ¶87 above. More specifically, these statements (including those identified in ¶86 as well as the information presented in the charts provided in the Offering Documents concerning Patient 1's data reproduced at ¶57 above), were materially false and misleading because they presented key biomarker results showing that Patient 1 had improved after treatment with KYV-101 but failed to disclose the most current adverse data about Patient 1 that was then-existing and available to Defendants as of the date of the IPO, which showed that Patient 1's condition had worsened. Specifically, by January 12, 2024—nearly four weeks before Kyverna's IPO—Patient 1's anti-dsDNA levels had *increased* considerably to over 250 IU/mL, and C3 and C4 complement levels had *decreased* considerably to 45 mg/dL and 10 mg/dL, respectively, to values consistent with high LN disease activity. In fact, Patient 1's C3 and C4 levels had fallen *below* Patient 1's initial reported C3 and C4 levels prior to any treatment. Relatedly, these statements were also rendered materially misleading because they omitted to disclose that Patient 1 had relapsed sometime between December 2023 and January 2024 prior to the Offering.

**B.    The Who, What, When, Where and How of the Materially False and Misleading Statements Alleged Regarding Patient 2's Clinical Data**

90.    With respect to the materially false and misleading statements (and related omissions) identified in ¶88 above concerning Patient 2, Plaintiff further alleges as follows:

a.    As to "who" made these allegedly false and misleading statements concerning Patient 2, Plaintiff states that they were made by Defendant Kyverna, as well as by each Individual Defendant who affixed their signature to the Offering Documents. Plaintiff further alleges that each Underwriter is deemed responsible for and liable for all such statements (and related omissions) pursuant to the express statutory text of §11 of the Securities Act.

b.    As to the "what" of these allegedly false and misleading statements concerning Patient 2, such statements are specifically identified in ¶88 above, including with reference to the information presented in the charts provided in the Offering Documents concerning Patient 1's data reproduced at ¶57 above.

c.    As to the "when" of these allegedly false and misleading statements concerning Patient 2, Plaintiff states that they were made effective as of 4:00 p.m. on February 7, 2024, which was the time and date when the SEC declared the Offering Documents to have become "effective."

d.     As to the "where" of these allegedly false and misleading statements concerning Patient 2, such statements were made in the Offering Documents, which were publicly available on, *inter alia*, both the SEC's and Kyverna's respective websites at all relevant times from no later than the moment that they were declared "effective" at 4:00 p.m. on February 7, 2024.

e.    As to the "how" of these allegedly false and misleading statements concerning Patient 2, Plaintiff states that the reasons why and how these statements were materially false or misleading are set forth in ¶88 above.  More specifically, the Offering Documents presented materially false and misleading clinical data for Patient 2 (as depicted in the charts referenced at ¶57 above) because they reported

29

positive data showing Patient 2's anti-dsDNA and C3 and C4 complement levels to Day 95, but *failed* to disclose then-existing, adverse data that was available to Defendants as of the IPO showing that Patient 2's UPCR had worsened by Day 95. The Offering Documents reported Patient 2's UPCR only to Day 67, showing that it had fallen to 0.5, which represented a significant improvement. However, by Day 95, Patient 2's UPCR had increased nearly five-fold to 2.5, indicating that proteinuria, a hallmark of LN, had returned. The adverse data showing Patient 2's UPCR after Day 67 was not included in the Offering Documents.

## CLASS ACTION ALLEGATIONS

91. Plaintiff repeats and realleges each and every allegation contained in ¶¶1-90 above as if fully set forth herein.

92. Plaintiff brings this Action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, Kyverna common stock issued pursuant or traceable to the Company's IPO ("Class").

93. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Kyverna, members of Kyverna's board of directors, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which any Defendant has or had a controlling interest, or any affiliate of Kyverna.

94. The members of the Class are so numerous that joinder of all members is impracticable. The Company's common stock was actively traded on the NASDAQ, a national securities exchange. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the Class. During the relevant time, millions of Kyverna shares were publicly traded on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Kyverna, its transfer agent, and by the Underwriter

Defendants, and they can be notified of the pendency of this Action by mail or electronic means using a form of notice similar to that customarily used in securities class actions.

95. Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws and their role in issuing or signing the defective Offering Documents or in underwriting the IPO. Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

96. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

a. whether Defendants violated the Securities Act;

b. whether the Offering Documents contained materially inaccurate or misleading facts about the business, operations, and prospects of Kyverna;

c. whether the Offering Documents omitted material facts required to be stated therein or that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

d. the extent of damage sustained by Class members and the appropriate measure of such damage.

97. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

**CLAIM ONE**

**For Violations of §11 of the Securities Act**
**(Against All Defendants)**

98. Plaintiff repeats and realleges each and every allegation contained in ¶¶1-97 above as if fully set forth herein.

31

99.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class against all Defendants.  This is a strict liability cause of action.

100.    Plaintiff does not (and need not) allege that any Defendant *intended* to mislead investors in publishing the materially misleading statements and omissions in the Offering Documents.  Plaintiff alleges that regardless of whether those misstatements and omissions were made innocently, negligently, recklessly, or intentionally, *prima facie* liability attaches because of the inaccurate and misleading nature of those material statements and omissions.  Plaintiff, though disclaiming any obligation to do so, also states and avers that nothing pled herein requires a finding or necessary inference that any Defendant acted with fraudulent intent, inasmuch as it remains possible, for example, that the Individual Defendants may have innocently or negligently failed to update the clinical data as reported in the Offering Documents because they (a) honestly (though mistakenly) believed that they had no duty to ensure that the Offering Documents contained the most current data; (b) erroneously believed that the Offering Documents did include all of the most recent data that was in Kyverna's possession or otherwise available to Kyverna; or (c) were unaware of, or otherwise failed to ensure that, Kyverna personnel had verified with third-party laboratories that those labs had no more current data on any patient that was required to make any statement (including any chart of patient data) included in the Offering Documents not materially false or misleading.  Similarly, it is possible, consistent with the allegations set forth herein, that the Underwriter Defendants were simply operating under a misunderstanding as to whether the most current patient data had in fact been included in the Offering Documents, and/or as to all of the steps that they could have taken to ensure that the information and statements concerning the KYV-101 patients in the Offering Documents was not materially false or otherwise misleading.

101.    As to Defendant Kyverna, Plaintiff repeats and realleges its allegations that Kyverna is strictly liable in all scenarios for any materially false or misleading statement in the Offering Documents, because as the issuer of the securities at issue Defendant Kyverna does not have even the ability to try to assert a statutory affirmative due diligence defense (which is potentially available only to non-issuer defendants, i.e., the Individual and Underwriter Defendants).

102.    The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted the statement of material facts required to be stated therein.

103.    As to the Individual Defendants, the Individual Defendants each signed the Offering Documents.  As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the Offering Documents to be complete and accurate.  Each Individual Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Offering Documents misleading, and that they contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  Accordingly, the Individual Defendants are liable under §11 of the Securities Act to Plaintiff and the Class.

104.    As to the Underwriter Defendants, each Underwriter Defendant served as an underwriter of the IPO.  As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  Each Underwriter Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents, and to ensure that such statements were true and accurate, that there were no omissions of material facts that would make the Offering Documents misleading, and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, each Underwriter Defendant should have known of the material misstatements and omissions contained in the Offering Documents and should have known of the omissions of material facts necessary to make the statements made therein not misleading.  Accordingly, each Underwriter Defendant is liable under §11 of the Securities Act to Plaintiff and the Class.

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:24-CV-08869-PCP

105.    None of the Individual or Underwriter Defendants named in this claim made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, without omission of any material facts, and were not misleading.  In alleging the foregoing, Plaintiff reiterates that it remains each Individual and Underwriter Defendants' burden to establish any affirmative "due diligence" defense in order to avoid strict liability for the Securities Act violations alleged herein.  Plaintiff further reiterates that, as the issuer, Kyverna is strictly liable for the materially misleading statements and omissions in the Offering Documents, regardless of whether they were made innocently, negligently, recklessly, or intentionally.

106.    By reason of the conduct alleged herein, each Defendant named in this claim violated §11 of the Securities Act.

107.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein were forward-looking statements.  Rather, each such statement (or omission of fact) concerned then-existing facts.  Moreover, the Offering Documents did not properly identify any of the untrue statements alleged herein as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

108.    Plaintiff acquired the Company's securities pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein.  Plaintiff sustained damages and the price of the Company's shares declined substantially due to material misstatements in the Offering Documents.

109.    This claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

110.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

## CLAIM TWO

### For Violations of §12(a) of the Securities Act
### (Against All Defendants)[13]

111.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1-97 above as if fully set forth herein.

112.    By means of the defective Prospectus, Defendants promoted, solicited, and sold Kyverna shares to Plaintiff and other members of the Class.

113.    The Prospectus for the IPO contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff, and the other members of the Class who purchased Kyverna shares pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, and to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus, as set forth above.

114.    Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Kyverna shares.

115.    By reason of the conduct alleged herein, Defendants violated §12(a)(2), 15 U.S.C. §77$l$(a)(2), of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Kyverna securities, pursuant to the Prospectus, sustained substantial damages in connection with their purchases of the shares.  Accordingly, Plaintiff and the other members of the Class who hold Kyverna securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their Kyverna shares to the Defendants sued herein.  Class members who have sold their Kyverna securities seek damages to the extent permitted by law.

---

[13]    Plaintiff understands the Court dismissed this cause of action for failing to satisfy the "direct purchaser" requirement.  Plaintiff re-alleges the claim here for the purpose of maintaining this claim in the event of an appeal.

35

**CLAIM THREE**

**For Violations of §15 of the Securities Act**
**(Against the Individual Defendants)**

116.    Plaintiff repeats and realleges each and every allegation contained in ¶¶1-97 above as if fully set forth herein.

117.    This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class against each of the Individual Defendants.

118.    The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, and had the power to influence, and exercised same over, the Company to cause it to engage in the conduct complained of herein.  Similarly, each of the other Individual Defendants not only controlled those subject to liability as primary violators of §11 of the Securities Act, as alleged above, they directly participated in controlling Kyverna by having signed, or authorized the signing of, the Registration Statement and authorizing the issuance of Kyverna securities to Plaintiff and members of the Class.

119.    As control persons of Kyverna, each Individual Defendant is jointly and severally liable pursuant to §15 of the Securities Act with, and to, the same extent as Kyverna for Kyverna's violations of §11 of the Securities Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on Plaintiff's own behalf and on behalf of the Class, prays for relief and judgment as follows:

A.    Declaring that this Action is a proper class action, pursuant to Fed. R. Civ. P. 23, certifying Plaintiff as a representative of the Class, and designating Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the other members of the Class compensatory damages;

C.    Awarding Plaintiff and the other members of the Class rescission and/or rescissory damages on their §12(a)(2) claims;

D.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.      Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury of all issues that may be so tried.

DATED:  April 20, 2026                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                                */s/* John T. Jasnoch
                                                John T. Jasnoch (CA 281605)
                                                600 W. Broadway, Suite 3300
                                                San Diego, CA 92101
                                                Tel.: (619) 233-4565
                                                Fax: (619) 233-0508
                                                jjasnoch@scott-scott.com

                                                William C. Fredericks (*pro hac vice*)
                                                Thomas L. Laughlin, IV (*pro hac vice*)
                                                Matthew A. Peller (*pro hac vice*)
                                                **SCOTT+SCOTT**
                                                **ATTORNEYS AT LAW LLP**
                                                The Helmsley Building
                                                230 Park Avenue, 24th Floor
                                                New York, NY 10169
                                                Tel.: (212) 223-6444
                                                Fax: (212) 223-6334
                                                wfredericks@scott-scott.com
                                                tlaughlin@scott-scott.com
                                                mpeller@scott-scott.com

                                                *Co-Lead Counsel for Plaintiff Clement Matthys*
                                                *and the Proposed Class*

                                                Brian J. Schall
                                                Andrew Brown
                                                **THE SCHALL LAW FIRM**
                                                2049 Century Park East, Suite 2460
                                                Los Angeles, CA 90067
                                                Tel:  (310) 301-3335
                                                Fax: (310) 388-0192
                                                brian@schallfirm.com
                                                andrew@schallfirm.com

                                                *Co-Lead Counsel for Plaintiff Clement Matthys*
                                                *and the Proposed Class*

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:24-CV-08869-PCP