United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANGELO RONDINI, et al.,
Plaintiffs,

v.

KYVERNA THERAPEUTICS, INC., et al.,
Defendants.

Case No. 24-cv-08869-PCP

**ORDER DENYING MOTION TO DISMISS**

Re: Dkt. Nos. 77, 78

In this putative securities class action, plaintiff Clement Matthys alleges that defendant Kyverna Therapeutics, Inc., its executives, and the underwriters of its initial public offering (IPO) made materially false or misleading statements in offering documents in advance of Kyverna's 2024 IPO. Matthys claims that the alleged statements and omissions violated §§ 11, 12(a)(2), and 15 of the Securities Act. Defendants now move to dismiss this action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court denies defendants' motion except with respect to Matthys's § 12(a)(2) claim.

**BACKGROUND**

Kyverna is a clinical-stage biopharmaceutical company focused on developing cell therapies to treat patients with autoimmune diseases.[1] The company conducted its IPO in February 2024. In connection with the IPO, Kyverna filed a registration statement with the Securities and Exchange Commission (SEC) on January 16, 2024, which became effective on February 7, 2024. Kyverna also filed a prospectus with the SEC on February 8, 2024.

At the time of its IPO, Kyverna had no commercial products on the market, and its lead product candidate (KYV-101) was in an early stage of clinical development. KYV-101 "involves a

[1] The Court accepts the allegations in Matthys's second amended complaint as true for the purposes of this Rule 12(b)(6) motion.

United States District Court
Northern District of California

single infusion of genetically modified white blood cells called CD19 CAR T-cells, which are engineered to target and eliminate specific B-cells in the body that contribute to the abnormal immune activity seen in autoimmune diseases." Prior to the IPO, Kyverna received Food and Drug Administration (FDA) approval to test KYV-101 on patients with lupus nephritis and had started two clinical trials. The first trial (KYSA-1) was based in the United States and had enrolled two patients. The other (KYSA-3) was based in Germany and had enrolled only one patient.

Early results from the trials were promising, and Kyverna touted these early clincal-trial results in its registration and prospectus (collectively, offering documents). The first clinical-trial patient (Patient 1) had been dosed as part of the KYSA-1 trial sometime in July 2023. Over the next 120 days, Patient 1 exhibited significant improvements in each of the four key biomarkers associated with lupus nephritis.[2] The second patient in the KYSA-1 trial (Patient 2) similarly exhibited improvements—the trial reported positive trajectories in three of four key biomarkers for 95 days following treatment, and in the fourth biomarker for 67 days following treatment. Data for the 95-day-mark on the fourth biomarker was absent from the prospectus. The patient in the KYSA-3 trial also produced positive data, though that patient's later dosing date meant that only preliminary data was available at the time of the IPO.

In light of these early results, the offering documents cast KYV-101 as a potential breakthrough that might provide "the ability to reset the immune system with a single, well-tolerated treatment" and "improve the patient experience for those suffering from lupus nephritis, offering potential long-term benefits without the costs, inconveniences and toxicities associated with repeat treatments of existing therapies." At the same time, however, the offering documents noted that clinical testing is a "lengthy" and "inherently uncertain process." Kyverna therefore

[2] These biomarkers are "(a) Urinary Protein-Creatinine Ratio ("UPCR"), which shows protein levels in the urine; (b) anti-dsDNA levels, the auto-antibodies associated with [lupus nephritis]; (c) levels of C3 complement proteins, which are consumed during an active immune response, and (d) levels of C4 complement proteins, which are also consumed during an active immune response." As the amended complaint explains, "the key indicators that [a lupus nephritis] treatment … is having a beneficial effect … are typically declines in UPCR levels and anti-dsDNA levels and increases in C3 and C4 levels. Conversely, increases in UPCR and anti-dsDNA levels and decreases in C3 and C4 levels … are key indicators of an increase in [lupus nephritis] activity, and are associated with … relapse."

warned investors that "[t]he result of preclinical studies and early clinical trials of [its] product candidates may not be predictive of the results of later-stage clinical trials"; that "companies in the biopharmaceutical industry" commonly "suffer[] significant setbacks in advanced clinical trials … notwithstanding promising results in earlier trials"; and that "many companies that have believed their product candidates performed satisfactorily in clinical trials have nonetheless failed to obtain marketing approval of such product candidates" from the FDA or other regulatory authorities. As a result, "there c[ould] be no assurance that any of [Kyverna's] current or future clinical trials will ultimately be successful or support [FDA] approval of [its] current or any future product candidates." And as the offering documents made clear: "If [Kyverna] [we]re unable to develop, receive regulatory approval for, and ultimately successfully commercialize [its] product candidates, or experience[d] significant delays in doing so, [its] business w[ould] be materially harmed."

Kyverna's offering documents presented the clinical-trial data that was "available as of December 31, 2023," which, as noted above, was promising. But at some point in the months before Kyverna's IPO on February 8, 2024, the KYSA-1 trial generated additional data for Patients 1 and 2 that painted a less rosy picture. As Kyverna later disclosed at a conference in June 2024, Patient 1's "disease recurred, and she was placed back on immunosuppressants" "between months five and six" following her initial treatment with KYV-101 in July 2023—that is, sometime in December 2023 or January 2024. That investor presentation was filed with the SEC that same day, and it similarly indicated that by Day 165 following Patient 1's initial treatment (meaning sometime between mid-December 2023 and mid-January 2024), her "clinical results had worsened" across all relevant biomarkers "to levels associated with [lupus nephritis]." The data Kyverna presented at the June 2024 conference also showed that Patient 2 had suffered a recurrence of one key biomarker associated with lupus nephritis, proteinuria (or elevated levels of protein in the urine). Although Kyverna's offering documents had reported most of Patient 2's biomarker data through day 95, the documents had reported data relating to proteinuria only through day 67. And the June 2024 disclosure revealed that Patient 2 had returned to markedly high urine-protein levels between days 67 and 95.

In its IPO, Kyverna offered shares of its common stock at a price of $22 per share. On the day before the June 2024 disclosure, the company's stock closed at a price of $14.44 per share. But on the day of the disclosure, Kyverna's stock fell to a closing price of $9.53 per share, followed by a further fall to $7.89 at the close of the next trading day.

Matthys purchased Kyverna stock on the secondary market in seven transactions between June 4, 2024, and July 17, 2024. In his second amended complaint, he asserts claims under §§ 11, 12(a), and 15 of the Securities Act of 1933 against on behalf of a putative class "consisting of all persons and entities that purchased, or otherwise acquired, Kyverna common stock issued pursuant to or traceable to the [c]ompany's IPO." Matthys alleges that the offering documents "contained materially false and misleading statements" concerning Patient 1 and Patient 2's responses to KYV-101 and improvements to their biomarkers associated with lupus nephritis.

The Court previously dismissed Matthys's amended complaint with leave to amend, and Matthys's subsequently filed a second amended complaint. Now before the Court is defendants' motion to dismiss the second amended complaint.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Dismissal is required if the plaintiff fails to allege facts allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In considering a Rule 12(b)(6) motion, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the nonmoving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009). While legal



United States District Court
Northern District of California

conclusions "can provide the [complaint's] framework," the Court will not assume they are correct unless adequately "supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

In addition to satisfying Rule 12(b)(6), a plaintiff alleging violations of the Securities Act based on fraud must satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to plead fraud as to each allegedly fraudulent statement with "particularity." *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

## ANALYSIS

### I. Matthys plausibly alleges that defendants violated § 11.

Section 11 of the Securities Act "provides a private cause of action for investors who purchase securities pursuant to a registration statement containing 'an untrue statement of a material fact' or a registration statement that omits 'to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Hunt v. PricewaterhouseCoopers LLP (PwC)*, 159 F.4th 603, 611 (9th Cir. 2025) (quoting 15 U.S.C. § 77k(a)). In his second amended complaint, Matthys claims that the offering documents "contained materially false and misleading statements" in violation of § 11 because they presented positive early clinical data for Patients 1 and 2 without including later, less favorable data collected for each patient.[3]

Defendants previously conceded that the omitted clinical data concerning Patients 1 and 2 was material, and they make no attempt to argue otherwise in their briefing on their renewed motion to dismiss. *See* Order Granting Motion to Dismiss, Dkt. No. 69, at 6. Instead, defendants

[3] Although Matthys no longer expressly disclaims a fraud-based theory in his second amended complaint, he disclaims such a theory in his opposition to the motion to dismiss. *See* Opposition to Defendants' Motion to Dismiss, Dkt. No. 81, at 22-24. The Court therefore does not assess Matthys's claims under the heightened Rule 9(b) standard courts are required to apply to fraud-based claims.

argue that plaintiff fails to plead that the omitted data was known or reasonably available to them before the IPO. *See* Motion to Dismiss Second Amended Complaint, Dkt. No. 77, at 8-13. Defendants also more broadly contend that the plaintiff's second amended complaint is "substantially unchanged" from the previous complaint. *See* Motion to Dismiss Second Amended Complaint, Dkt. No. 77, at 7-8.

"Section 11 places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). So long as "a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Id.* "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996) (quoting *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994)).

Conversely, section 11 imposes a high standard on defendants: "Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (quoting *Herman & MacLean*, 459 U.S. at 382). The Ninth Circuit has "noted that Section 11 lacks a scienter requirement." *Id.* at 860. As a result, "defendants [can] be liable for innocent or negligent material misstatements or omissions." *In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1404 (quoting *Kaplan*, 49 F.3d at 1371).

Even though § 11 has no scienter requirement and an "innocent misstatement" is sufficient for a § 11 claim, *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (quoting *Herman & MacLean*, 459 U.S. at 382), the standard is not an impossible one for defendants to satisfy because courts have recognized that there is no duty to disclose information that the defendants could not possibly have known or learned. *See In re Keegan Mgmt. Co., Sec. Litig.*, 794 F. Supp. 939, 946 (N.D. Cal. 1992) ("Section 11 … does not impose liability for the omission of material information which was unknown to, and not reasonably discoverable by, the defendants."); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994); *Sodha v. Golubowski*, 154 F.4th 1019, 1035 (9th Cir. 2025) (holding that § 11 permits "claims against a

registrant that knew about a material event before the IPO but chose not to disclose it"). Defendants urge the Court to adopt a knowledge requirement—that is, to require that Matthys plead that defendants knew about the adverse clinical data. But that would impose a scienter requirement that is plainly not required for a § 11 claim. Instead, what is required to state a § 11 claim is something far less stringent: that defendants made an "innocent or negligent material misstatement[] or omission[]." *In re Stac Elecs. Sec. Litig.*, 89 F.3d at 1404 (quoting *Kaplan*, 49 F.3d at 1371).

Matthys pleads that the relevant information existed at the time of the IPO. The only issue here, then, is whether the complaint plausibly alleges that it was possible for defendants to discover the relevant information. The Court previously concluded that plaintiff's first amended complaint failed to plead that the information was available to defendants. *See* Order Granting Motion to Dismiss, Dkt. No. 69, at 9. But Matthys has filed a second amended complaint, and the second amended complaint plausibly alleges that, at the time of the IPO, defendants could have reasonably discovered the adverse clinical data that was omitted from the offering documents.

Kyverna's clinical trial included only three patients, and the relevant events here are the adverse clinical results experienced by Patients 1 and 2. Because the clinical trial involved so few patients, adverse data pertaining to any of the three patients had the potential to influence Kyverna's share price.

Turning first to Patient 1, Matthys alleges that the June 2024 disclosures suggest that the KYSA-1 trial generated data showing a recurrence in Patient 1's lupus nephritis around 165 days following her treatment with KYV-101 in July 2023. That would have been no later than January 12, 2024.

Although Kyverna disclosed Patient 1's lupus nephritis recurrence in June 2024, it is unclear when Kyverna actually learned that information from the independent investigators conducting the KYSA-1 trial. To fill in that missing information, Matthys relies on statements from three former Kyverna employees who served as confidential witnesses. These statements support a plausible inference that even if defendants were not actually aware of the adverse clinical data omitted from the offering documents at the time of the IPO on February 8, 2024,

United States District Court
Northern District of California

United States District Court
Northern District of California

defendants could have reasonably discovered it.

Two of the confidential witnesses quoted in the amended complaint indicated that they were unaware of the adverse clinical data concerning Patient 1 until after the IPO. Former Employee #1, "a former project manager in clinical operations for the KYSA-1 trial[,] … did not learn until after the fact that Patient 1 had relapsed, but recalled learning about it 'very close to the IPO.'" Second Amended Complaint, Dkt. No. 72, at 20. Former Employee #2, "a former medical science liaison who handled developing and executing strategies to support bringing Kyverna's treatments to the market," was similarly involved in the KYSA-1 trial. *Id.* Former Employee #2 "noted that … information about the relapse was the kind of information that normally would be shared with [Former Employee #2] given [their] position in medical affairs at" Kyverna. *Id.* But like Former Employee #1, they did not learn of Patient 1's adverse clinical data before the IPO and "only became aware of the relapse when Kyverna disclosed it publicly" in June 2024. *Id.* That these employees involved in Kyverna's management of the KYSA-1 trial did not learn of Patient 1's relapse until after the IPO plausibly suggests that the information was not known to anyone at Kyverna at the time of the IPO. But even if Kyverna did not, in fact, know that information at the time of the IPO, that is not dispositive as to whether Kyverna *could have* discovered Patient 1's relapse. If Kyverna could have learned about Patient 1's relapse, but for some reason did not, then that "innocent misstatement" could nonetheless constitute a § 11 violation. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (quoting *Herman & MacLean*, 459 U.S. at 382).

A third confidential witness, Former Employee #3, "was a Clinical Trial Manager at Kyverna" during the relevant period and "oversaw operations for the KYSA-1 trial." *Id.* at 21. One of Former Employee #3's duties "was to ensure that data collected from clinical trial patients by the study sites would be transmitted to Kyverna in a prompt and timely manner." *Id.* The second amended complaint does not include any statement that Former Employee #3 learned about Patient 1's relapse prior to the IPO, but it does state that Former Employee #3 indicated that "it could take roughly a week for a site coordinator to enter the relevant patient test data into the … system." *Id.* at 21-22. Former Employee #3 also "stated that it was not uncommon for Kyverna to call the study site coordinator to ask for information to be entered more quickly if Kyverna needed

it." *Id.* at 22. Matthys therefore alleges that "patient test results were effectively available to Kyverna immediately after they were recorded." *Id.* at 22. Because Matthys alleges that Kyverna could almost immediately learn about any adverse patient data collected at the study sites and that it was not uncommon for Kyverna to call the site coordinator to get the information quickly, the second amended complaint plausibly supports an inference that Kyverna could have reached out to the site coordinator to discover Patient 1's relapse prior to the February 8, 2024 IPO.

The second amended complaint also plausibly supports an inference that Kyverna could have learned about Patient 2's adverse data prior to the IPO. The offering documents included data for Patient 2 concerning three of the four key biomarkers associated with lupus nephritis through day 95 following Patient 2's treatment with KYV-101. But the offering documents included data concerning the fourth biomarker, levels of protein in the urine, only through day 67. As Kyverna disclosed in June 2024, Patient 2 exhibited significantly elevated levels of protein in the urine between days 67 and 95, indicating increased lupus nephritis activity. Matthys alleges that, because the offering documents reported data for Patient 2's other biomarkers through day 95, the adverse data on the level of protein in Patient 2's urine must also have been available to defendants before the IPO "[y]et … was omitted from the [o]ffering [d]ocuments." *Id.* at 25. Again, the relevant inquiry is whether Kyverna could have learned about Patient 2's adverse data before the IPO. Given that Patient 2's adverse results came between days 67 and 95 and other data regarding Patient 2 from that same period was reported in the offering documents, Matthys's allegations support a plausible inference that Kyverna could have discovered that data prior to the IPO if the company had tried to do so.

In sum, because Kyverna chose to include positive information about Patients 1 and 2 in its registration statement and Matthys's second amended complaint includes plausible allegations that defendants had the ability to discover the adverse data regarding those same patients before the IPO, Matthys has stated a claim under § 11. Accordingly, the Court denies defendants' motion to dismiss that claim.

**II. Matthys adequately alleges a § 15 claim.**

Matthys also asserts a claim under § 15 of the Securities Act. *See* 15 U.S.C. § 77*o*.

"Section 15 penalizes persons who control a company that violates Sections 11 and 12." *Sodha v. Golubowski*, 154 F.4th 1019, 1032 (9th Cir. 2025). "[S]ection 15 … require[s] underlying primary violations of the securities laws." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012). It is well-established that a "Section 15 claim rises or falls with the others." *Sodha*, 154 F.4th at 1032. Because Matthys plausibly alleged his § 11 claim, he also adequately alleges a § 15 claim. *See Pino v. Cardone Cap.*, LLC, 139 F.4th 1102, 1109 n.2 (9th Cir. 2025).

**III. Matthys fails to state a claim under § 12(a)(2).**

Lastly, Matthys reasserts a claim against defendants under § 12(a)(2) of the Securities Act, which imposes liability on "[a]ny person who … offers or sells a security … by means of a prospectus …, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements … not misleading." 15 U.S.C. § 77l(a)(2). Plaintiff acknowledges that "the Court dismissed this cause of action for failing to satisfy the 'direct purchaser' requirement" and states that he "alleges the claim here for the purpose of maintaining this claim in the event of an appeal." Second Amended Complaint, Dkt No. 72, at 38 n.15. The Court dismisses Matthys's § 12(a)(2) claim for the same reasons discussed in its prior order. *See* Order Granting Motion to Dismiss, Dkt. No. 69, at 12-13.

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is denied except with respect to Matthys's § 12(a)(2) claim. Dismissal of that claim is with prejudice and without leave to amend.

**IT IS SO ORDERED.**

Dated: October 20, 2026

P. Casey Pitts
United States District Judge

United States District Court
Northern District of California